COMMONWEALTH vs. PETER VITELLO.

Middlesex. March 6, 1978. — September 26, 1978.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS,
& ABRAMS, JJ.

*Evidence,* Polygraphic test; Opinion: expert; Judicial discretion; Relevancy and materiality; Competency. *Witness,* Expert. *Practice, Criminal,* Directed verdict. *Identification.*

Discussion of prior decisions of this court on the admissibility of polygraph evidence. [428-431]

Discussion of the nature of the polygraph method. [431-440]

Discussion of evidentiary considerations pertinent to the use of a polygraph examination in the context of a criminal trial. [440-443]

Discussion of policy considerations with respect to the use of polygraph evidence in the context of a criminal trial. [443-447]

Discussion of the admissibility of polygraph evidence in other jurisdictions. [447-450]

In a criminal case polygraph evidence may not be introduced during the Commonwealth's case in chief as substantive evidence of guilt. [450-452] BRAUCHER, J., with whom WILKINS, J., joined, dissenting.

In a criminal case, exculpatory polygraph evidence may not be introduced during the defendant's case in chief as substantive evidence of innocence. [452-453]

Polygraph evidence may be introduced at a criminal trial for the purpose of impeaching or corroborating the defendant's testimony. [453-457]

At a criminal trial, the judge erred in allowing the prosecutor to introduce polygraph evidence unfavorable to the defendant as independent evidence of guilt during the Commonwealth's case in chief. [457] QUIRICO, J., concurring. KAPLAN, J., concurring. BRAUCHER, J. with whom WILKINS, J., joined, dissenting.

At the trial of a defendant charged with armed robbery, an extrajudicial photographic identification by a witness was admissible as substantive evidence where the witness made a positive in-court identification of the same photograph, even though he testified that the defendant was not the robber. [457-459]

At a robbery trial, there was no error in allowing a police officer to testify that a photograph selected by a witness as that of the robber depicted the defendant where the officer testified that he had known the defendant for a long time and had seen him often. [459-460]

At a robbery trial, an extrajudicial photographic identification of the defendant was sufficient to warrant the denial of the defendant's motion for a directed verdict even though the witness who had made the identification denied during the trial that the defendant was the robber. [460-461]

INDICTMENT found and returned in the Superior Court on April 13, 1976.

The case was tried before *Mazzone*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Maurice F. Ford* for the defendant.

*Susan C. Mormino*, Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant was indicted for armed robbery, G. L. c. 265, § 17, and was found guilty after a jury trial. He appealed under the provisions of G. L. c. 278, §§ 33A-33G. We transferred the case here from the Appeals Court on our own motion. G. L. c. 211A, § 10 (A).

Considering only those assignments of error that have not been waived for failure to brief the arguments adequately, see *Commonwealth* v. *Martin*, 358 Mass. 282, 290 (1970), we are presented with two issues. First, did the trial judge err in allowing testimony regarding a polygraph examination unfavorable to the defendant to be introduced during the Commonwealth's case in chief? Second, should the judge have granted the defendant's motions for directed verdict made after the Commonwealth's case in chief and at the completion of all the evidence?

1. *Admissibility of polygraph evidence not favorable to the defendant.* Prior to trial, the defendant moved that he be allowed to take a polygraph examination, at the expense of the Commonwealth, "for the purpose of intro-

ducing its results into evidence" at the trial. The same
judge who later presided at the trial allowed the motion
after hearing. The examination was conducted by an em-
ployee of an agency selected by the defendant, and ap-
proved by the court.

After the jury had been empanelled but before the
opening statements, the defendant's counsel asked the
judge at a bench conference whether the polygraph evi-
dence would be limited to impeaching the defendant's
credibility should he take the stand, or whether it would
be admissible as "substantive" evidence. The judge an-
swered that, should he find the examiner to be qualified,
the polygraph evidence would be admissible as part of the
Commonwealth's case in chief. The judge also decided
that the prosecutor could advise the jury during his open-
ing of the polygraph evidence he expected to introduce.
The defendant took exception to this ruling. After the
prosecutor completed his opening statement in which he
stated that the prosecution would offer testimony by the
polygraph examiner that the defendant was untruthful
in his responses of denial that he had committed the
robbery, the defendant moved for a mistrial. The motion
was denied and the defendant excepted.

Following a voir dire hearing, the judge found that the
examiner was qualified as an expert on polygraphy and
could testify. Over the objection and exception of the de-
fendant, the examiner took the stand as part of the Com-
monwealth's case in chief. The examiner stated that, in
his opinion, the examination did not support the truthful-
ness of the defendant's denials of involvement in the rob-
bery. The defendant assigns as error the admission of this
testimony. We agree that this testimony was improperly
admitted.

We begin our discussion with a consideration of our
prior decisions on the admissibility of polygraph evi-
dence. In *Commonwealth* v. *A Juvenile*, 365 Mass. 421
(1974), we deviated from our earlier view that the results
of a polygraph examination were not admissible as evi-

dence in a criminal case because the polygraph had not yet achieved "general acceptance by the community of scientists involved." *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269-270 (1963). Since our decision in *A Juvenile*, we have not had occasion to elaborate on the principles and guidelines set forth therein.[1]

In *A Juvenile*, the issue presented was whether the trial judge had erred in denying the juvenile's pretrial motion for admission of polygraph test results. The juvenile, in his appeal, argued that developments in the field of polygraph testing since *Fatalo*, as well as the acceptance of polygraph results as evidence by a few trial courts, justified a conclusion that the "general acceptance" standard of *Fatalo* had been satisfied. We concluded that "[a]lthough . . . scientific and legal developments indicate that the polygraph is making progress in a hoped for evolution toward complete evidentiary recognition, we nevertheless are unwilling to say at this time that the standard in the *Fatalo* case has been met." 365 Mass. at 425.

Despite our conclusion in *A Juvenile* that polygraph test results should not be generally admissible in evidence, a majority of the court recognized that a properly conducted test had potential value "as an aid to determining whether an individual is telling the truth." *Id.* at 429. Emphasizing that we intended to take "but a cautious first step toward the acceptance of polygraph testing," *id.* at 432, we held that the technique "has advanced to the point where it could prove to be of significant value to the

[1] But cf. *Commonwealth* v. *Stewart*, 375 Mass. 380, 383-385 (1978) (person cannot be compelled to take polygraph examination); *Commonwealth* v. *Howard*, 367 Mass. 569 (1975) (in jury waived trial, appearance of fair trial compromised by willingness of judge to substitute results of polygraph test for his own judgment based on all the evidence); *Commonwealth* v. *Chase*, 372 Mass. 736, 751-752 (1977); *Commonwealth* v. *Graziano*, 371 Mass. 596 (1976); *Commonwealth* v. *A Juvenile (No. 1)*, 370 Mass. 450 (1976); *Commonwealth* v. *Patterson*, 4 Mass. App. Ct. 70, 76-78 (1976).

criminal trial process if its admissibility initially is limited to carefully defined circumstances designed to protect the proper and effective administration of criminal justice." *Id.* at 425.[2]

Although we emphasized in *A Juvenile* our general intention "not to overrule *Commonwealth* v. *Fatalo* . . . , and not to make polygraphic evidence generally admissible," *id.* at 433 n.11, we did not attempt to indicate in any precise manner what evidentiary purposes could be accomplished by the admission of evidence as to polygraph test results. Contemplating that more detailed and comprehensive guidelines would be forthcoming in future decisions, *id.* at 432-433, we left a number of questions unanswered. See *id.* at 448-450 (Quirico, J., dissenting); *id.* at 452-453 (Kaplan, J., dissenting). It is thus understandable that one trial judge, relying on *A Juvenile*, could conclude that favorable polygraph evidence is admissible only to corroborate the defendant's testimony, see *Commonwealth* v. *Moynihan, post* 468 (1978), while another trial judge could conclude in this case that unfavorable polygraph evidence is admissible as part of the Commonwealth's case in chief.

Although the instant case and the *Moynihan* case indicate that the time has come to elaborate on the holding of *A Juvenile,* we emphasize that this is not an appropriate occasion to reexamine the type of factual questions

---

[2] In *A Juvenile*, we required that: (1) the defendant move that a polygraph test be conducted; (2) he agree in advance that the test result be admissible irrespective of its outcome; (3) the judge inform the defendant of his constitutional right against self-incrimination; and (4) the judge assure himself, and make appropriate written findings, that any waiver of such right is made voluntarily, knowingly, and intelligently. *Id.* at 431-432. Additionally, before admitting the results of the test, the judge must (1) conduct a voir dire inquiry to determine the qualifications of the examiner based on the examiner's training, experience, and demonstrated ability; and (2) make appropriate findings. After these steps have been taken, the judge "may then, in his discretion, admit the examiner's testimony concerning the test results as evidence to be considered with all other evidence." *Id.* at 431.

presented to and considered by this court in *Fatalo* and *A Juvenile.* Specifically, no evidence has been submitted on the question of the scientific reliability or acceptability of the polygraph method. Rather, we accept as current and valid the finding of the court in *A Juvenile* that the "general acceptance" standard of *Fatalo* has not yet been achieved. We seek only to clarify when, and for what purposes, a trial judge may allow in evidence testimony concerning a polygraph examination that has been conducted within the guidelines established by *A Juvenile.* To determine these questions we consider the factors of (a) the nature of the polygraph method; (b) pertinent considerations of the rules of evidence; and (c) policy.

(a) *The polygraph method.* A great deal has been written concerning the theoretical and practical aspects of the polygraph method, and numerous authorities have analyzed and debated its impact on the judicial process. We take note of the various authorities and treatises on the subject not as a substitute for evidence as to the reliability or limitations of the polygraph method but rather to recognize the views of various courts and authors on the subject. We limit our inquiry primarily to those aspects of the polygraph method that shed light on its evidentiary nature and capacity. In particular, we highlight the role of the polygraph examiner in administering, analyzing, and describing[3] the polygraph test.

The polygraph method consists of a complex, and incompletely understood, series of interactions among (1) the subject, (2) the polygraph machine, and (3) the examiner. Each of these three facets of the "lie detection"

---

[3] Although we will use the term "examiner," distinctions profitably could be made between the tasks of administering the test, performed by the "operator"; the task of examining the recording of physiological data, performed by the "examiner"; and the task of testifying in court as to the results of the test, performed by the "expert." See Axelrod, The Use of Lie Detectors by Criminal Defense Attorneys, 3 Nat'l J. Crim. Def. 107, 109 (1977) (hereinafter cited as Axelrod). The three roles are typically filled by one person.

process can be broken down into constituent parts. Focusing first on the response of the subject, it is theorized that (a) the act of lying or deceiving leads to conscious conflict, (b) which induces fear or anxiety, (c) which results in measurable physiological events such as changes in skin resistance (perspiration), respiration, blood pressure, heart rate, blood flow, skin temperature, muscle tension, pupillary diameter, gastric motility, and blood oxygen saturation. See Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694, 699-700 (1961) (hereinafter cited as Skolnick). These psychophysiologic reactions are largely controlled by the autonomic nervous system, which functions automatically and involuntarily. See Abrams, Polygraphy Today, 3 Nat'l J. Crim. Def. 85, 88 (1977) (hereinafter cited as Abrams). The theory that conscious lying can be detected reliably by measuring involuntary physiological changes thus seems to assume a regular relationship between lying and certain emotional states, and a regular relationship between emotional states and changes in the body. The validity of both these assumptions has been questioned.[4]

---

[4] "Lying can conceivably result in satisfaction, excitement, humor, boredom, sadness, hatred, as well as guilt, fear or anxiety. Not uncommon are pathological individuals who, for various reasons, believe in their lies or are unconcerned about them." Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L.J. 694, 700 (1961) (hereinafter cited as Skolnick). The measurement of physiological responses may be complicated by the "tension level" of the subject as well as the nonspecific "spontaneous" autonomic activity. *Id.* at 701. The following factors have also been suggested as bearing on the reliability of the physiological responses: uncomfortable room temperature, or instrument discomfort; abnormal blood pressure, obesity, or heart or respiratory irregularities; mental incompetence, psychopathy, or schizophrenia; fatigue or intoxication; lack of concern, rationalization, yoga-like abstraction, or extreme nervousness; controlled breathing, hidden muscular contractions, or self-inflicted pain. Note, Polygraphy: Short Circuit to Truth? 29 U. Fla. L. Rev. 286, 296-297 (1977), and sources cited therein. Other concerns are noted in Axelrod, *supra* at 123-125, and sources cited therein.

Proponents of the polygraph, although admitting that complete

The second facet of the polygraph method—the mechanical and electrical functioning of the polygraph machine—appears to be the best understood, and least controversial, aspect of the process. Although there are some differences in the functioning of the various types of polygraphs, the higher quality machines are generally conceded accurately to measure and record changes in blood pressure, heart rate, respiration, and skin resistance. Stress-sensing devices may also be provided to measure body movements and muscle flexing—activities which could disrupt the measurement of critical variables.[5]

The activities of the examiner in administering and analyzing the polygraph examination constitute the most controversial facet of the polygraph method. We have already acknowledged, in general terms, the crucial role played by the examiner, see *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 427 (1974), and have emphasized the obligation of the trial judge to satisfy himself of the examiner's qualifications, *id.* at 429-430. A more detailed perusal of the examiner's role is warranted at this junc-

theoretical understanding and justification of the process have not been attained, note that there is more than sufficient empirical evidence of its validity and reliability. E.g., Abrams, Polygraphy Today, 3 Nat'l J. Crim. Def. 85, 89-97 (1977) (hereinafter cited as Abrams). Moreover, the knowledgeable examiner will be aware of the potential problem areas, and will take steps to identify or avoid sources of error. See J.E. Reid & F.E. Inbau, Truth and Deception 194-274 (2d ed. 1977), a leading teaching and reference source for practitioners.

[5] The mechanical and electrical operations of the polygraph are described in Reid & Inbau, at 5-6. That authority also describes research conducted with the goal of improving existing sensing devices. *Id.* at 375-385. The potential for future research is indicated, noting the possible utility of "other physiological parameters such as instantaneous pulse rate (cardiotach), electroencephalic (brainwaves), or electromyographic (electrical changes in muscles) recordings." *Id.* at 385. The potential use of computers to "standardize examiner interpretation" of polygraph charts is also noted. However, at least one such attempt to "computerize" the output of the polygraph has failed. Axelrod, *supra* at 129.

ture, however, as the issue before us is the proper use of the examiner's testimony at trial.

Administration of the polygraph examination may be divided into four distinct phases: data collection, pretest interview, testing, and post-test interview. Abrams, at 98 (1977). See J. E. Reid & F. E. Inbau, Truth and Deception, at 11-63 (2d ed. 1977) (hereinafter cited as Reid & Inbau). During the data collection phase, it has been suggested that the examiner will read all available reports, talk with investigating officers, and talk with attorneys. He will investigate the subject's medical, psychiatric, and educational history so that he will be aware of potential problems that might inhibit or preclude testing. Abrams, at 98. See note 4, *supra*. This initial phase of the examination provides the groundwork on which the second phase —the pretest interview—is based.

Perhaps the most critical aspects of the polygraph examination take place before the machine itself is turned on. "Although truth or deception are determined by the individual's physiological responses, the polygraph procedure itself is *primarily a psychological approach*" (emphasis supplied). Abrams, at 99. It is essential to the entire polygraph process that the proper psychological framework be established during the pretest interview. Specifically, it is at that time that the examiner must instill in the subject a respect for the polygraph machine and a belief that the truth cannot be hidden from the machine and the examiner. The reinforcement of these attitudes continues during the testing phase.[6] The rationale for

_____

[6] One of several "stimulation" techniques employed by the examiner is the "card test." The subject is given seven cards and told to take one card, look at it, and put it back in the group without showing it to the examiner. While attached to the polygraph machine, the subject is directed to answer, "No," when asked whether each of the seven cards was the one chosen, thereby producing one "lie." The examiner looks at the polygraph chart and tells the subject which card produced the lie. The examiner then says: "Now we know the lie detector . . . is adjusted properly to you. We have a clear picture of what it looks like when you are not telling the truth." Reid & Inbau, at 43. In fact, the

creating an image of infallibility is expressed thus: "Concern over possible detection appears to be the principal factor accounting for the physiological changes that are recorded and interpreted as symptoms of deception. . . . In fact, . . . *unless a person is concerned over the possibility that his deception will be detected, his Polygraph records will not disclose that deception*" (emphasis supplied).[7] Reid & Inbau, at 61.

Statements and actions of the examiner directed at establishing the infallibility of the polygraph process are thus essential prerequisites to eliciting physiological responses of noticeably distinctive character. These are not, however, the only instances of psychological or behavioral learning applied by the polygraph examiner. A crucial part of the testing phase—that period when the polygraph machine is actually attached to the subject—has nothing to do with the operation of the machine. Rather, the examiner is instructed to observe carefully the behav-

cards have been marked or otherwise arranged so that the examiner knows in advance which card is picked by the subject. The reasons for this deception are: "(1) the card test record itself may not actually disclose the card 'lie'; (2) the primary purpose of the card test is the 'stimulation' effect . . . ; and (3) the chosen card must be definitely known in those instances where a subject attempts to evade detection either by distorting the tracings through various kinds of breathing or muscular movements or by other tactics." *Id.* at 42 n.49. Reid and Inbau emphasize throughout their work the importance of building an image of infallibility. E.g., *id.* at 38, 46. The resulting heightened state of concern in the mind of the subject who has something to hide is the desired "stimulation" effect.

[7] The authors also noted that a properly conducted pretest interview, in addition to "stimulating the lethargic liar into displaying Polygraphic responsiveness," should have the effects of "allaying the apprehensions of the truthful subject [and] nullifying the hostility of the hostile one." Reid & Inbau, at 24. Should the subject continue to harbor doubts and skepticism about the polygraph, it might be deduced that a lying subject would less likely be detected, and a truthful or angry subject would more likely be branded dishonest because anxiety or anger would be mistaken for deception. An analogy to "trial by ordeal" is not inappropriate since in both circumstances "the subject must believe in the efficacy of the diagnostic instrument in order for it to achieve maximum response." Skolnick, at 705.

ior of the subject to detect tell-tale signs of deception.[8] The
work by Reid and Inbau is replete with references to
supposed behavioral clues, such as the following: "Many
times [a lying subject] will, in contrast to the truth-telling
subject, squirm around in the chair, look away from the
examiner, cross his legs, use his hands as though trying
to dust something off his clothes, or engage in other simi-
lar tension-relieving activities." Reid & Inbau, at 17. The
examiner is exhorted to pay particular attention to these
and many other types of behavior such as whether or not
the subject is delaying in answering questions, *id.* at 19,
is coughing or sniffing, *id.* at 23, or is suffering from
physical distress as evidenced by gurgling stomach
sounds, tired eyes, or masklike features. *Id.* at 295.
Another very important behavioral consideration is
whether the subject has attempted to "beat the machine"
by controlling his breathing, flexing his muscles, or en-
gaging in other suspicious activities observed by the ex-
aminer. *Id.* at 23, 63, 71-192. See Note, Polygraphy: Short
Circuit to Truth? 29 U. Fla. L. Rev. 286, 301-302 (1977).

The examiner will also question the subject to learn
how his responses compare to preconceived norms. For
example: "A [rape] suspect may be asked: 'Have you ever
thought about forcing a girl to have sexual intercourse
with you? Now if you did, that wouldn't mean you did it.
But if you did think about doing it, say so, in order that
you will have it off your mind during the test.' The truth-
ful person's characteristic answer is an immediate 'no.'
The rapist, on the other hand, will usually respond, after
some hesitation and obvious concern, by saying: 'Yes, ev-

---

[8] Behavioral observations are not limited to the testing phase; the
examiner and his associates are encouraged to note the behavior of the
subject from the moment he arrives for the examination to the mo-
ment he departs. Reid & Inbau, at 292. The observations of a secretary
or receptionist regarding the subject's reactions to polygraph reading
material in the examiner's waiting room are seriously weighed by the
examiner. Skolnick, at 704. Note, Polygraphy: Short Circuit to Truth?
29 U. Fla. L. Rev. 286, 301-302 (1977).

erybody has such thoughts; but I didn't do it.'" Reid &
Inbau, at 19.

Although the examiner is warned that no "final conclu-
sions" should be drawn from the above described "indica-
tions of probable deception or truthfulness," those indica-
tors are portrayed as "very helpful as factors to be consid-
ered in the ultimate decision to be made of truthfulness
or deception." Id. at 23. In fact, assessment of the behav-
ioral and psychological clues will often determine wheth-
er to administer a series of tests beyond the basic tests,
id. at 44, whether one or another of the polygraph ma-
chine's physiological sensors should be ignored or dis-
counted,[9] and, to a substantial if not a major extent,
whether the ultimate conclusion is one of truthfulness or
deception.[10]

The last of the four phases of the examination process
involves the analysis of the polygraph chart and the post-
test interview with the subject. Abrams, at 104. The
analysis of the chart is complicated considerably by the
need to take into account unusual physiological re-
sponses due to anxiety, anger, generalized guilt feelings,

---

[9] The examiner's subjective determination of whether the subject is
"intelligent" or "educated" may have a substantial effect on how the
examiner will read the polygraph records. In the case of an intelligent
and educated subject, the examiner is warned that changes in blood
pressure and pulse "are not dependable as true deception responses"
unless accompanied by respiration changes. Reid & Inbau, at 60. More
reliable is the respiration tracing alone. Id. In contrast, "[I]n cases
involving unintelligent, uneducated subjects, their deception may be
revealed in blood pressure-pulse changes alone, without any accompa-
nying changes or irregularities in respiration." Id.

[10] Reid and Inbau emphasize that "whereas a subject's behavior may
be very helpful in the overall diagnosis of deception there are, as is
true in most general rules, some exceptions" such as are presented by
distraught, neurotic, or apprehensive subjects. "The percentage of
truthful subjects within these groups is small, however, and the prob-
lem presented is relatively minor. Nevertheless, sole or even major
reliance should not be placed upon behavior symptoms; they should be
considered only in the context of the entire Polygraph examination."
Reid & Inbau, at 296.

Commonwealth *v.* Vitello.

and so forth.[11] After interpreting the chart and assessing the observed behavioral clues, the examiner will often conduct a post-test interview with the subject to discuss the findings. If the conclusion is that the subject has been deceptive, the interview presents an opportunity to determine if some unknown factor—such as "guilty knowledge" other than that gained by participation in the crime—was the cause of the deception. Abrams, at 104. It also presents an opportunity to accuse or interrogate a subject whose examination either indicated deception or was inconclusive for the purpose of obtaining an admission or confession.[12] Reid & Inbau, at 307.

Having concluded a review of the polygraph technique —with emphasis on how it is applied by the qualified and competent examiner—we are in a position to make some specific observations to complement our conclusion in *A Juvenile* that "[e]qual to the importance of the machine itself is the competence, experience, and education of the test examiner." *Commonwealth* v. *A Juvenile,* 365 Mass. 421, 427 (1974).

First, the polygraph machine and the recordings it produces are merely tools in the hands of the examiner; the machine is not independently capable of discerning truth from deception. "As a *scientific* instrument . . . all that can legitimately be claimed for the polygraph is that through physiological responses it may provide clues to

---

[11] Other aspects of interpreting the chart recordings in which the examiner must exercise care and judgment include: determining pen movement threshold levels; establishing timing between stimulations and responses; correlating the responses of the separate physiological sensors; and accounting for idiosyncracies of the subject. Note, Polygraphy: Short Circuit to Truth? 29 U. Fla. L. Rev. 286, 299-300 (1977). The examiner must also be aware of the "halo effect"—the tendency for unconscious bias to be introduced into the examiner's evaluations. *Id.* at 300. Skolnick, at 711-714.

[12] Various studies have reported the startling statistics that confessions are achieved in between 60% to 85% of those polygraph examinations in which the subject was believed to have exercised deception. See Axelrod, at 133; *State* v. *Green,* 271 Or. 153, 167 n.7 (1975).

veracity that are more detailed than those afforded by visual observation of the subject in an interview." Skolnick, at 714. Even the most avid supporters of the polygraph would likely agree that while "[v]alidity is greater than for any other psychological technique, . . . it must be recognized that accuracy is almost totally dependent upon the skill of the polygraphist." Abrams, at 105.

Second, the successful use of the polygraph method is highly dependent on the mental attitude and beliefs of the subject at the time the test is administered. If the subject does not believe in the infallibility of the process, or is unconcerned or fatalistic about the outcome, the efficacy of the procedure is seriously compromised. A similar problem may be presented by a subject who has successfully rationalized and justified his actions, or who has cleared his conscience by confessing to a clergyman prior to the test, and who does not respond to the examiner's efforts to arouse the subject's emotions. Reid & Inbau, at 228.

Third, behavioral clues constitute a substantial factor in the examiner's intermediate decisions—such as the choice of tests to administer and questions to ask—as well as in the examiner's ultimate conclusion with regard to truth or deception. These behavioral clues are employed according to the examiner's empirically based beliefs and intuitions regarding the psychological aspects of lying and of the examination process.[13]

---

[13] One commentator has observed that "[a]part from keen personal insight, the [polygraph] process demands familiarity with several medical specialties, plus an understanding of clinical and social psychology. At present, most lie-detector examiners have a professional police background, and much less formal scientific training than cardiologists and psychiatrists." Skolnick, at 707. Reid and Inbau maintain that a training period of six months is sufficient, and describe the training program offered at the Reid College of the Detection of Deception in Chicago. The first three months of the program consist of specialized instruction in "interviewing techniques; behavior symptoms; question formulation; test procedures; instrument operation; the physiological, psychological and legal aspect of the technique; and

With these observations in mind, we proceed to consider the evidentiary role that should be assigned to the testimony of a polygraph examiner.

(b) *Evidentiary considerations*. In order to assess more clearly the proper role of the polygraph in the criminal trial context, it is helpful to return briefly to basic evidentiary principles. We start with the concept of "relevancy." Evidence is relevant if it renders the desired inference more probable than it would be without the evidence. *Poirier* v. *Plymouth*, 374 Mass. 206, 210 (1978). *Green* v. *Richmond*, 369 Mass. 47, 59 (1975). Cf. Fed. R. Evid. 401. The general rule in this Commonwealth is that all relevant evidence is admissible unless barred by an exclusionary rule. *Poirier, supra* at 210. Cf. Fed. R. Evid. 402.[14]

Additional fundamental considerations are involved with regard to the offering of the testimonial evidence of "experts." Here, the concept of "competency" is also at play, invoking the notion that a minimum level of reliability must be observed in a rational system of proof making. See K. B. Hughes, Evidence § 281, at 334 (1961). Although most rules of competency are directed at the capacity of prospective witness to take the stand, the rules

post-examination interrogation tactics and techniques." Reid & Inbau, at 305. The second three months are principally devoted to conducting examinations under supervision.

[14] The distinction is sometimes made between "logical" relevancy and "legal" relevancy. See Trautman, Logical or Legal Relevancy—A Conflict in Theory, 5 Vand. L. Rev. 385 (1952). Compare the following formulation: "[I]t would seem that the legal concept of relevancy is made up of a blend of (1) inherent probative worth; (2) materiality; (3) the discretionary application of safeguards against confusion, unfairness, undue consumption of time, and prejudice. To this blend must be added certain exclusionary rules." W.B. Leach & P.J. Liacos, Massachusetts Evidence, at 296 (4th ed. 1967) (hereinafter cited as Leach & Liacos). See K.B. Hughes, Evidence § 284 (1961). Cf. Fed. R. Evid. 403. It is also the case that "[t]he concept of relevancy, or inherent probative worth, is as much practical as legal." Leach & Liacos, at 294. See J.B. Thayer, A Preliminary Treatise on Evidence, at 269 (1898).

regarding expert testimony are directed to the witness's capacity to speak to a particular matter. McCormick, Evidence § 69 (2d ed. 1972) (hereinafter cited as McCormick). It must be shown that an expert "possesses sufficient skill, knowledge or experience in the field of his testimony that the jury may receive appreciable assistance from it." *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975). See W. B. Leach & P. J. Liacos, Massachusetts Evidence, at 97 (4th ed. 1967) (hereinafter cited as Leach & Liacos) (must be able to give "competent aid" to jury). Cf. Fed. R. Evid. 702-705.

When the expert's opinion is grounded on a newly developed body of scientific or expert knowledge, there is an additional question of reliability involved; in effect, the "competency" of the body of knowledge is implicated. Leach & Liacos, at 94-95. Cf. *Commonwealth* v. *Devlin*, 365 Mass. 149, 155 (1974). The question presented is "whether there is a consensus of expert opinion which the court can accept as creating a valid basis for expert testimony." Leach & Liacos, at 94. This concern was clearly articulated in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), a case involving a predecessor of the modern polygraph machine.[15] As we previously noted, the "general acceptance" standard of *Frye* was adopted by this court with regard to polygraph evidence in *Commonwealth* v. *Fatalo*, 346 Mass. 266, 269 (1963), in which we indicated our willingness to "accept the benefits of science" provided that such benefits are "supported by substantial authority establishing scientific reliability." Accord,

---

[15] "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

*Commonwealth* v. *A Juvenile,* 365 Mass. 421, 425 (1974);
*Commonwealth* v. *Lykus,* 367 Mass. 191, 203 (1975) (scientific principle must be "generally accepted by those who would be expected to be familiar with its use").

Our approach to the admissibility of polygraph evidence thus far has been firmly grounded on practical concerns and policy considerations such as are advanced by the concept of "legal" relevancy. See note 14, *supra.* We have already noted that the controversial nature of the polygraph method invites "the danger that on the introduction of such evidence a trial could descend into a battle of experts on the probative value of the polygraph test rather than a determination of the guilt or innocence of a defendant. The end result, in all likelihood, would be confusion instead of enlightenment." *Commonwealth* v. *Fatalo, supra* at 269. See *Commonwealth* v. *Lykus, supra* at 197. See part 1 (c) i, *infra.* Other policy considerations may also be identified.[16] To be added to this picture are those concerns which reflect the uncertain reliability of polygraph evidence. The "substantial doubts which presently revolve about the polygraph test," *Fatalo, supra* at 270, have not yet been resolved. See *A Juvenile, supra* at 425.

Thus, notwithstanding the potential probative value of polygraph evidence, the general acceptance standard of admissibility stated in *Frye, Fatalo,* and *A Juvenile* recognizes practical concerns and serves as well to protect the fairness and integrity of the trial process. Nonetheless, we recognized in *A Juvenile* that failure to achieve the standard of general acceptance need not freeze the evidentiary development of the polygraph in view of its unique potential as a tool of justice. Instead, we took a "cautious first step" in the further balancing of those policy considerations which are evoked by the use of poly-

---

[16] See 9 Suffolk U.L. Rev. 886, 892 (1975). Cf. Note, Polygraphy: Short Circuit to Truth? 29 U. Fla. L. Rev. 286, 294 (1977).

graph evidence in court.[17] "It is in the very process of making explicit the applicable policies of exclusion that we clear away the confusion and provide a rational basis for determining admissibility." Trautman, Logical or Legal Relevancy—A Conflict in Theory, 5 Vand. L. Rev. 385, 397 (1952).

(c) *Policy considerations.* Starting from the proposition that logically relevant evidence is presumptively admissible, the following considerations of general applicability must then be taken into account in order to arrive at a fair and workable scheme for the use of polygraph evidence:

[17] McCormick maintains that " '[g]eneral scientific acceptance' is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time" (footnotes omitted). McCormick, Evidence § 203, at 491 (2d ed. 1972) (hereinafter cited as McCormick). See McCormick, Deception-Tests and the Law of Evidence, 15 Cal. L. Rev. 484, 500 (1927); *United States* v. *DeBetham,* 348 F. Supp. 1377, 1384 (S.D. Cal.), aff'd per curiam, 470 F.2d 1367 (9th Cir. 1972), cert. denied, 412 U.S. 907 (1973); *Worley* v. *State,* 263 So. 2d 613, 615 (Dist. Ct. App. Fla. 1972) (Mager, J., concurring); Kaplan, The Lie Detector: An Analysis of its Place in the Law of Evidence, 10 Wayne L. Rev. 381, 392 (1964). We believe that the application we have made of the general acceptance test is not so far removed in theory or in practice from the approach espoused by McCormick. The test is accurately described as "strict," Kaplan, *supra* at 392, for its purpose is to counterbalance the usual presumption that probative evidence is admissible. It is a rule of exclusion, giving general effect to policy considerations such as those mentioned by McCormick. As such it is to be distinguished from evidentiary considerations to be applied at the discretion of the judge or fact-finder. Cf. *Commonwealth* v. *Lykus,* *supra* at 203-204. Arising as it does from practical concerns, the general acceptance test is amenable to adaptation to meet practical needs. Thus, in *A Juvenile,* we held fast to the test—often applied as a strict bar to admission—while accepting the utility of admitting polygraph evidence in limited circumstances. Cf. *Commonwealth* v. *Gilbert,* 366 Mass. 18, 24-25 (1974); *Commonwealth* v. *Devlin,* 365 Mass. 149, 154-155 (1974). Our task here is to define those limited circumstances for this and future cases. This approach is to be distinguished from the view that polygraph evidence, assumedly falling short of achieving judicial notice of the efficacy of its underlying theory, should then be admissible under general relevancy standards. Kaplan, *supra* at 392.

*i. Confusion and prejudice to the jury.* Perhaps the most
often cited reason for subjecting polygraph evidence to
special scrutiny is the potential for confusing and prejud-
icing the jury. Such considerations have been invoked to
exclude probative evidence generally. See 1 J. Wigmore,
Evidence § 29a (1940); 6 J. Wigmore, Evidence § 1904
(Chadbourn rev. 1976); McCormick § 185, at 439-440.
Polygraph evidence has been viewed as presenting
uniquely difficult problems. See *A Juvenile, supra* at 447
& n.11 (Quirico, J., dissenting). Like many scientific de-
vices, the polygraph may assume a posture of "mystic
infallibility" in the eyes of the jury. *Commonwealth* v.
*Lykus, supra* at 197. Unlike most other forms of scientific
evidence, polygraph evidence is often presented in a form
that directly addresses the guilt or innocence of the de-
fendant. *Id.* Compare Kaplan, The Lie Detector: An
Analysis of its Place in the Law of Evidence, 10 Wayne
L. Rev. 381, 407-409 (1964), with Koffler, The Lie Detector
—A Criticial Appraisal of the Technique as a Potential
Undermining Factor in the Judicial Process, 3 N.Y.L.F.
123, 147-150 (1957) (hereinafter cited as Koffler). Because
of popular misconceptions regarding the operation and
capacity of the polygraph machine, it has been suggested
that "if the evidence of a criminal defendant's polygraph
test results were admitted at his trial, it could turn out
to be the conclusive determinant of his guilt or innocence,
despite the doubts about the test's accuracy." *A Juvenile,*
*supra* at 446 (Quirico, J., dissenting). See 9 Suffolk U.L.
Rev. 886, 899 n.60 (1975); Highleyman, The Deceptive
Certainty of the "Lie Detector," 10 Hastings L. Rev. 47,
63-64 (1958). Levitt, Scientific Evaluation of the "Lie De-
tector," 40 Iowa L. Rev. 440, 458 (1955). It has also been
demonstrated that the stronger the general reputation of
the polygraph for infallibility, the more likely it is that
when an error does occur and a truthful person is labeled
deceptive that person will be wrongly convicted even if
there otherwise is only fragmentary evidence of guilt.
Koffler, *supra* at 146. That such miscarriages of justice

will inevitably, or even frequently, result, however, is far from established. See *United States* v. *Ridling*, 350 F. Supp. 90, 98 (E.D. Mich. 1972); Note, Problems Remaining for the "Generally Accepted" Polygraph, 53 B.U.L. Rev. 375, 387 n.107 (1973). Nonetheless, it hardly can be contested that the polygraph presents unusually substantial dangers of jury confusion and prejudice to which the ameliorative provisions of *A Juvenile*—the full availability of cross-examination of the polygraph expert and the inconclusive nature of polygraph evidence—are not complete defenses.[18]

ii. *Intrusion into jury function.* A related, but distinct, concern is that use of polygraph evidence may usurp the jury's historic role of determining the credibility of witnesses, and finding facts. See, e.g., *Commonwealth* v. *Lykus, supra* at 197; *A Juvenile, supra* at 447 (Quirico, J., dissenting); *United States* v. *DeBetham*, 348 F. Supp. 1377, 1390 (S.D. Cal.), aff'd per curiam, 470 F.2d 1367 (9th Cir. 1972), cert. denied, 412 U.S. 907 (1973). In our view, this concern goes beyond the possibility that a jury will, in fact, be so influenced by polygraph evidence that it effectively abnegates its responsibilities as independent fact finder. What is here at stake is the appearance of justice and the preservation of the perception that conviction rests on the judgment of one's peers. See Note, Polygraphy: Short Circuit to Truth? 29 U. Fla. L. Rev. 286, 298 (1977). As has been stated in a somewhat different context: "The issue before us is whether we are to abandon our traditional system of adversary litigation with emphasis upon dignity for 'scientific' trial with emphasis upon truth." Silving, Testing of the Unconscious in Criminal Cases, 69 Harv. L. Rev. 683, 702 (1956).[19]

---

[18] Cf. 55 B.U.L. Rev. 302, 309 (1975) (special problems in cross-examining and discrediting polygraph examiner). *Contra, Cullin* v. *State*, 565 P.2d 445, 458 (Wyo. 1977).

[19] "Public confidence in the omniscience of 'science' is greater than the trust medieval men placed in torture as a method of eliciting truth. There can hardly be any doubt that as soon as expert testimony

iii. *Consumption of time and use of trial resources.* The efficient operation of the trial system is another of the long recognized concerns which counterbalance the inclination to admit all probative evidence. See *Reeve* v. *Dennett*, 145 Mass. 23, 28 (1887); *Commonwealth* v. *DiStatsio*, 294 Mass. 273, 282 (1936); 6 J. Wigmore, Evidence § 1907 (Chadbourn rev. 1976); Fed. R. Evid. 403. Use of the polygraph at trial implicates the concern for efficiency and manageability in several ways. First, the introduction of polygraph evidence through the testimony of an expert witness will consume a substantial amount of time, as indeed it must if significant questions regarding the polygraph method are to be brought out effectively in cross-examination. Although this might ordinarily be discounted as a necessary price to pay, the impact on the process of criminal trials is particularly acute here because the polygraph is a potentially crucial element in every criminal case. The fewer the restrictions that, as matter of policy, are put on the admissibility of polygraph evidence, the more important this consideration becomes. But cf. *United States* v. *Ridling, supra* at 98 (development of polygraph will result in fewer full trials because cases will be dismissed or pleas entered). Thus, whereas undue consumption of time might in the usual course be the concern of the trial judge on a case by case basis, cf. *A Juvenile, supra* at 434 n.12, we think that the special circumstances applicable to the polygraph require a broader view.

A second, related consideration is the inordinately large burden that indiscriminate requests for admission of polygraph evidence would place on the trial judge. We

as to the result of psychological tests is, in principle, admitted, the weight of procedure will shift from the courtroom to the testing laboratory. The psychiatrist will become the real judge. Moreover, like torture, psychological testing cannot be conducted in public. Where the issues are decided in a laboratory, the institution of public trial is obviously a farce" (footnote omitted). Silving, Testing of the Unconscious in Criminal Cases, 69 Harv. L. Rev. at 701-702 (1956).

have charged judges with the important task of satisfying themselves that a prospective expert polygraph witness is fully qualified. *A Juvenile, supra* at 429. In addition, our closer examination of the polygraph method, see part 1 (a), *supra*, convinces us that the judge should also be satisfied that the subject was amenable to testing, that the test conditions were proper, and that the test questions were appropriately phrased and presented. See *Commonwealth* v. *Graziano*, 371 Mass. 596 (1976) (reliability of polygraph results should be resolved in first instance by trial judge). Cf. *United States* v. *Ridling, supra* at 97 (judge should appoint polygraph expert to determine questions of propriety and reliability and to complement opinions of the defendant's expert); *State* v. *Brionez*, 90 N.M. 566 (Ct. App. 1977). The effort which a judge must expend in reaching these determinations will be considerable.

(d) *Precedent in other jurisdictions.* Similar policy considerations, sometimes stated but more often not,[20] have led many courts to conclude that polygraph evidence should not be admitted in any circumstances. See, e.g., *Pulakis* v. *State*, 476 P.2d 474, 479 (Alas. 1970); *People* v. *Sweeney*, 46 Ill. App. 3d 858, 867 (1977); *State* v. *Gagne*, 343 A.2d 186, 192 (Me. 1975); *People* v. *Ranes*, 63 Mich. App. 498, 502 (1975); *Harrison* v. *State*, 307 So. 2d 557, 562 (Miss. 1975); *State* v. *Steinmark*, 195 Neb. 545, 548 (1976); *Warden, Nev. State Prison* v. *Lischko*, 90 Nev. 221, 224 (1974); *State* v. *Montgomery*, 291 N.C. 235, 243-244 (1976); *Commonwealth* v. *Gee*, 467 Pa. 123, 142 (1976); *State* v. *Watson,*      S.D.     , (1976);[a] *Robinson* v. *State*, 550 S.W.2d 54, 59 (Tex. Crim. App. 1977); *Jones* v. *Commonwealth*, 214 Va. 723, 725 (1974); Annot., 53 A.L.R.3d 1005,

[20] Policy issues are "seldom if ever discussed by the courts due to their uncritical reliance on *Frye* v. *United States*, [293 F. 1013 (D.C. Cir. 1923) ]." *United States* v. *DeBetham*, 348 F. Supp. 1377, 1389 (S.D. Cal.), aff'd per curiam, 470 F.2d 1367 (9th Cir. 1972), cert. denied, 412 U.S. 907 (1973).

[a]248 N.W.2d 398, 399 (1976).

1010-1011 (1973). There is almost no authority for the other extreme position—that polygraph evidence may be admitted even without the prior agreement of the parties. But see *State* v. *Bell*, 90 N.M. 134, 138 (1977); *State* v. *Dorsey*, 88 N.M. 184 (1975) (requiring only that evidence establish: [1] qualifications of polygraph operator; [2] reliability of testing procedure; and [3] validity of tests made on the subject). The remainder of the modern polygraph cases occupy intermediate positions and turn on the significance of "stipulations," "agreements," or "waivers" by the parties. These intermediate cases can be further categorized into two basic groups.

The first group is made up of those cases which invoke notions of "estoppel" or "fairness" to develop and explain their results. See Annot., 53 A.L.R.3d 1005, 1011-1014 (1973). Under the estoppel theory, a defendant who stipulates beforehand that the designated polygraph operator is qualified and that the procedure is accurate and reliable will not be heard to complain in the event that the test results are unfavorable. See, e.g., *Robinson* v. *Wilson*, 44 Cal. App. 3d 92, 106-107 (1974); *People* v. *Houser*, 85 Cal. App. 2d 686, 694-695 (1948); *State* v. *McNamara*, 252 Iowa 19, 29 (1960); *State* v. *Fields*, 434 S.W.2d 507, 512-514 (Mo. 1968).

The mere invocation of the term "estoppel" is perceived as providing sufficient justification for admission in most of those cases. It has also been asserted, however, that prior stipulations or agreements "imbue" the polygraph test with reliability and probative value where such qualities are otherwise lacking. *State* v. *Mick*, 546 S.W.2d 508, 509 (Mo. App. 1976). Such fanciful notions cannot, of course, be credited.[21] "If such tests are as un-

---

[21] The dissent correctly points out in this case that Vitello filed a motion to take a polygraph examination "for the purpose of introducing its results into evidence at his trial," and certified thereon personally that "he agrees to allow the results of his polygraph examination to be admitted into evidence even if the results are unfavorable to him." Nowhere in such "agreement" or motion is found an agreement

predictable and misleading as the courts are so certain they are, then their reliability and usefulness to the court and jury upon the ultimate question of guilt or innocence remains the same, regardless if they are admitted by stipulation or not." *People* v. *Zazzetta*, 27 Ill. 2d 302, 308-309 (1963). See *Cullin* v. *State*, 565 P.2d 445, 460 (Wyo. 1977) (Rose, J., specially concurring); Note, Polygraphy: Short Circuit to Truth? 29 U. Fla. L. Rev. 286, 310 (1977). Cf. Silving, Testing of the Unconscious in Criminal Cases, 69 Harv. L. Rev. 683, 690 (1956) (doctrine barring objective testing "viewed to be a general principle of democratic government expressed in criminal procedure, rather than a civil right of the examinee which he could waive"). Similar weaknesses are apparent in an appeal to "fairness" for the State, such as was advanced by the court in *Cullin* v. *State, supra* at 457: "Basic is the element that the State is entitled to fair treatment as is the defendant. Since the accused would undoubtedly rely on the results, if positive, it would be unreasonable to allow him to defeat their introduction because the results were unfavorable." It is submitted that the concept of evenhanded treatment of the parties to a criminal case has as little application in the context of the admission of polygraph evidence as it does to the State's burden of establishing proof beyond a reasonable doubt.

The second group of cases occupying intermediate positions is characterized by the imposition of certain conditions on admissibility notwithstanding prior stipulation or agreement by the parties. The seminal case is *State* v. *Valdez*, 91 Ariz. 274 (1962). The court held that polygraph evidence would be admissible on stipulation by the government and the defendant "to corroborate other evi-

that such evidence could be used as probative evidence of guilt. To charge the defendant with such an agreement based on *A Juvenile* as the dissent implies should be done seems unfair in light of disagreement demonstrated by this case and *Moynihan* between experienced trial judges as to the proper purpose for which such evidence should be admitted.

dence" of the crime and to corroborate or impeach the defendant's testimony if he should take the stand. A number of conditions were imposed on admissibility, however, including a reservation of the decision of admissibility to the trial judge: "[N]otwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence." *Id.* at 283.

The *Valdez* formulation has been adopted or adapted in a number of other jurisdictions. See, e.g., *State* v. *Galloway*, 167 N.W.2d 89 (Iowa 1969); *State* v. *Lassley*, 218 Kan. 758, 760 (1976); *State* v. *McDavitt*, 62 N.J. 36, 44-47 (1972); *State* v. *Souel*, 53 Ohio St. 2d 123, 133 (1978); *State* v. *Stanislawski*, 62 Wis. 2d 730, 741 (1974).

The *Valdez* formulation avoids what we perceive to be the more serious shortcomings of the first group of cases. We do not wholly adopt the *Valdez* approach, however, for reasons that will be developed in the next section.

(e) *The role of polygraph evidence in criminal cases.* In the instant case, the prosecution was allowed to introduce polygraph evidence unfavorable to the defendant as independent evidence of guilt during the Commonwealth's case in chief. In *Commonwealth* v. *Moynihan, post* 468 (1978), the circumstances of which are discussed here for convenience, the judge held that polygraph evidence favorable to the defendant was not admissible as independent evidence to refute the prosecution's evidence of guilt but could be admitted only to corroborate the defendant's testimony in the event he took the stand. We hold the judge in the instant case to have been in error; conversely, we agree with the ruling of the judge in *Moynihan*. We state our reasons.

i. *Use of unfavorable polygraph evidence to prove guilt.* As should be clear from our prior discussion, the issue to be addressed here is not whether unfavorable polygraph evidence has some probative value on the question of

guilt; rather the issue is whether the probative value of such evidence is of sufficient magnitude to outweigh the policy "costs," or probable dangers, that are associated with admission for the purpose of proving guilt. The balance weighs heavily against admission. We have already indicated the factors on the "cost" side of the balance: confusion and prejudice of the jury; intrusion into jury function; and use of trial resources. On the other side of the balance, the probative value of polygraph evidence on the question of guilt is diminished by the complexity of interactions among subject, examiner, and machine that are inherent in the method. Specifically, the examiner's ultimate conclusion regarding truth or deception depends to a considerable extent on the examiner's subjective perceptions and intuitions regarding the subject as well as the subject's perceptions of the examiner, the machine, and the test situation. See part 1(a), *supra.* Although an accurate understanding of the nature of these interactions in each particular case is essential to an assessment of the integrity of the polygraph "results," the interactions are subtle, subject to conscious or unconscious manipulation, and their full import not easily imparted to a jury.[22]

In view of the substantial impact that unfavorable polygraph evidence would have if admitted as independent evidence, the "costs" of admission, and the limited probative value of such evidence, we hold that, in cases such as the present one,[23] polygraph evidence may not be

[22] Perhaps the most disturbing deficiency inherent in the polygraph method is the potential for mistaking innocent anxiety and fear for guilty deception. See part 1 (a), *supra.* Limiting the admissibility of polygraph evidence may have the beneficial effect of reducing this problem: by relieving an innocent subject of the fear that failure to "pass" the test may result in very damaging independent evidence of guilt, anxiety is reduced and a serious misjudgment by the examiner may be averted.

[23] This is not a case in which the defendant's truthfulness is itself one of the ultimate issues. We reserve judgment on the use of polygraph evidence in such a case until one is before us. Cf. *United States*

introduced during the Commonwealth's case in chief for the independent purpose of proving guilt.[24]

ii. *Use of favorable polygraph evidence to prove innocence.* Many of the factors which entered the balance in considering the use of unfavorable polygraph evidence to prove guilt apply in the same measure to the use of favorable polygraph evidence to prove innocence. Additional considerations may also be brought to bear: First, the scope of effective rebuttal is limited in the case of exculpatory polygraph evidence. See Note, Problems Remaining for the "Generally Accepted" Polygraph, 53 B.U.L. Rev. 375, 377 & n.14 (1973). As to the test in issue, the prosecutor must take the questions of the polygraph examiner and the responses of the subject in the form they were recorded at the time of the test. The prosecutor cannot pursue a line of questioning or open up new areas that he might have asked if he had been present during the polygraph examination. The prosecutor could produce an expert to question the conclusion reached by the examiner based on the way the test was conducted or on the examiner's interpretation of the polygraph charts, but the effectiveness of this alternative is substantially undercut by the large part that subjective evaluations of the subject's behavior and responses play in the polygraph method.

A second reason for excluding exculpatory polygraph evidence during the defendant's case in chief is the possible destabilizing influence that admissibility would have on the reliability of polygraph results. With increased use of the polygraph at trial, it may be expected that levels of understanding and sophistication regarding the poly-

v. *Ridling,* 350 F. Supp. 90, 98 (E.D. Mich. 1972); McCormick, at § 187.

[24] It would be of no consequence if a defendant had agreed before the examination that the results could be admitted for any and all purposes. The evidentiary guidelines herein established are based on broad policy considerations that transcend the preferences of the individual parties to a criminal trial. See K.B. Hughes, Evidence § 4 (1961).

graph method will substantially increase among defend-
ants and defendants' lawyers. It will not be long before
ruses such as the "card test," see note 6, *supra*, are no
longer effective. The essential psychological ingredient of
the polygraph method—the subject's belief in the infalli-
bility of the polygraph machine, see text and notes 6, 7,
*supra*—may be present during any given test, or it may
be feigned. The danger is magnified by our conclusion
that unfavorable polygraph evidence must not be admit-
ted as independent evidence of guilt. We must therefore
expect that a knowledgeable guilty defendant will be
aware: (1) that he has nothing to fear from the polygraph
if he does not take the stand, see subsection iii, *infra*;
(2) that it is possible to beat the machine; and (3) that his
chances of beating the machine are greatly improved by
behaving normally, see text and notes 8-10, *supra*. A de-
fendant could arrange to take preliminary polygraph ex-
aminations to polish his technique.

Although some of these factors will be present irrespec-
tive of the evidentiary role that is assigned the polygraph,
the potential negative impact is greatest where the poly-
graph evidence is offered as tending to prove the inno-
cence of the defendant. A proper balancing of policy con-
siderations therefore requires that such offers of evidence
be rejected.

iii. *Use of polygraph evidence to impeach or corroborate
the defendant's testimony.* Although we have concluded
that polygraph evidence cannot be admitted as indepen-
dent evidence of guilt or innocence, different considera-
tions apply with regard to the use of the same evidence
for the limited purposes of impeaching or corroborating
the defendant's testimony. While we have expressed our
reservations regarding the distortions to the trial process
that could result from full admissibility of polygraph evi-
dence, we do not think it wise to bar the polygraph com-
pletely from the judicial arena. To the contrary, the expe-
rience gained by trial participants through the limited
and controlled use of polygraph evidence could eventual-

ly lead to the alleviation of many of the problems we have identified.

One of the accepted methods of impeaching the credibility of a witness in this Commonwealth is by attacking his reputation for truthfulness and veracity. Leach & Liacos, at 121-122. Evidence to rehabilitate the witness is then admissible. K. B. Hughes, Evidence § 244 (1961). Use of this type of "character" evidence is analogous, but not perfectly so, to the admission of polygraph evidence for the purpose of impeaching or corroborating the defendant's testimony.[25] Indeed, we think it accurate, based on our analysis of the role of the polygraph examiner, see part 1(b), *supra*, to describe an examiner as a potential "expert character witness." This is so because the polygraph examiner has no special knowledge of the acts or circumstances surrounding the criminal event; at most he can claim special knowledge of the truthfulness of the subject at the time of the examination.[26]

---

[25] Proof that a witness has the character trait of untruthfulness must be presented in the form of that witness's general reputation for truthfulness and veracity among those who know him, and not by evidence of particular acts of lying or by the private opinion of the impeaching witness. See K.B. Hughes, Evidence § 239 (1961), and cases cited; Leach & Liacos, at 121-123, and cases cited; *Commonwealth* v. *Belton*, 352 Mass. 263, 269, cert. denied, 389 U.S. 872 (1967); G. L. c. 233, § 21A. Cf. Fed. R. Evid. 608. In contrast, the polygraph examiner testifies as to his personal opinion based on the specific acts that he observed and that the polygraph machine recorded during the examination.

Another point of departure is the general rule that evidence to corroborate or sustain the credibility of a witness is not admissible until a direct attack has been made on that witness's credibility. K. B. Hughes, Evidence, § 244 (1961). We do not think that this rule should be applied to the admission of polygraph evidence to corroborate the defendant's testimony.

[26] Compare the *Valdez* formulation: "[I]f such evidence is admitted the trial judge should instruct the jury that the examiner's testimony *does not tend to prove or disprove* any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given." *State* v. *Valdez*, 91 Ariz. 274, 283-284 (1962).

Allowing the polygraph examiner to testify on the lim-
ited issue of the defendant's credibility as a witness fur-
thers several policy goals in addition to the ones already
mentioned. If the polygraph evidence is favorable, a de-
fendant with a criminal record, see G. L. c. 233, § 21, may
elect to testify, where he otherwise would not, on the
theory that the impact of the polygraph evidence will
offset the prejudicial impact of his criminal history. With
such encouragement for defendants to testify, the capaci-
ty of the trial process to determine the truth will be sig-
nificantly increased and the perception of fairness and
justice will be enhanced. Moreover, despite the doubts
that we harbour regarding the reliability of the poly-
graph method, it is arguably a more direct, and more
accurate, means of aiding the jury in judging the credibil-
ity of a witness than is the introduction of past criminal
behavior. Cf. *Commonwealth* v. *Bohannon, ante* 90
(1978); *Commonwealth* v. *Cook,* 371 Mass. 832 (1977);
G. L. c. 233, § 21.

On the other side of the coin, it may happen that an
innocent defendant will be determined erroneously by
the polygraph examiner to have lied. In that case, the
defendant may protect himself against this very damag-
ing evidence by forfeiting his right to testify, a solution
that undeniably compromises important goals of the judi-
cial process, but one which we think achieves the op-
timum balance of policy considerations as they exist at
this time. Cf. *United States* v. *Ridling,* 350 F. Supp. 90, 98
(E.D. Mich. 1972); *United States* v. *DeBetham,* 348
F. Supp. 1377, 1390 n.58 (S.D. Cal.), aff'd per curium, 470
F.2d 1367 (9th Cir. 1972), cert. denied, 412 U.S. 907 (1973);
Kaplan, The Lie Detector: An Analysis of its Place in the
Law of Evidence, 10 Wayne L. Rev. 381, 401 (1964). To the
extent that a prior criminal record would, in any event,
have deterred the defendant from taking the stand, there
will be no cost to the defendant of avoiding introduction

of the polygraph evidence. In this connection, it could be noted also that there will be no need to instruct the jury that failure to introduce favorable polygraph evidence should not be construed to the detriment of the defendant —a course of action that might be warranted if the polygraph were to achieve full evidentiary recognition and thus become a commonplace aspect of the trial process. The usual instruction cautioning the jury not to draw any inferences from the failure of the defendant to testify would be sufficient. See, e.g., *Commonwealth* v. *Sullivan,* 354 Mass. 598, 616-617 (1968), cert. denied, 393 U.S. 1056 (1969).

The defendant can also move, prior to the opening of the main case, or prior to his taking the stand, as the situation warrants, that a voir dire hearing be held on the questions of the potential polygraph witness's qualifications, the propriety of the test questions, and the propriety of the test conditions and procedure. In this manner, the situation can be avoided in which the defendant takes the stand in the expectation that favorable polygraph evidence will be introduced to corroborate his testimony, and then finds that the evidence is excluded for one of the reasons within the discretion of the judge. In a case in which the polygraph evidence is unfavorable , a hearing prior to the prosecutor's opening statement will prevent unnecessary prejudicial references to the test results in the event that the evidence is ruled inadmissible or the defendant makes known his good faith intention not to take the stand.[27] If, despite the unfavorable polygraph test results, the defendant takes the stand and the prosecution subsequently offers the testimony of the examiner for impeachment purposes, the defendant will be entitled to an instruction clearly advising the jury of the limited

---

[27] We have already noted that a trial judge may consider expert testimony prior to approving the administration of a polygraph test to a criminal defendant. *Commonwealth* v. *Graziano,* 371 Mass. 596, 599 n.3 (1976).

purposes for which the examiner's testimony is admitted. The prosecution would be entitled to similar instruction if the evidence is favorable.

(f) *The use of polygraph evidence in the instant case.* The judge in the instant case allowed the prosecution to introduce polygraph evidence unfavorable to the defendant as independent evidence of guilt during the Commonwealth's case in chief. This was error, as our discussion in part 1 (e) i, *supra,* indicates. In view of the other evidence presented in this case, we cannot say that admission of the polygraph evidence was harmless beyond a reasonable doubt, see *Commonwealth* v. *Graves,* 363 Mass. 863 (1973). The judgment must therefore be reversed and a new trial ordered.

We consider the second contention raised by the defendant, as the issues it raises are likely to reoccur in a new trial.

2. *Motions for directed verdict.* The defendant assigns as error the judge's denial of motions for directed verdict made after the Commonwealth's case in chief and at the completion of all the evidence. We set out the facts necessary for a determination of the issues raised by this assignment of error.

The essential facts are not disputed. During the evening of December 4, 1975, Edward Johnson was working as an attendant at a gasoline station in Everett. Johnson was alone at the station when, shortly after 10 P.M., a car pulled in. The driver, who was alone in the vehicle, demanded money. When Johnson refused, the driver got out of the car, hit Johnson, and pulled out a knife. After Johnson had handed over some money, the robber returned to his car and drove away. There was a light directly above the area in which the robbery occurred. Johnson noted that there were permanent pockmarks on the side of the robber's face. Johnson further described his assailant as being of medium build, about six feet tall, and having brown or black hair that was worn back. The robber had been wearing a brown suede coat with a big

white collar. Johnson testified that he had taken a good look at the robber and would "never forget his face."

A day or two after the robbery, Johnson went to the Everett police station and looked through a large number of photographs, perhaps over 200, but was unable to make an identification. On December 14, an Everett police officer brought to Johnson a group of about fifteen photographs. Johnson selected one of the photographs as being that of the robber. He was "positive" of the accuracy of the identification.

At the trial, Johnson was shown the same group of photographs and he identified the same photograph as being that of the robber. He testified that he was certain of the photographic identification and reiterated that he "wasn't going to forget [the robber's] face." When Johnson was asked, however, if he could identify anyone in the court room as the robber, he said that he could not. When the defendant was pointed out to him, Johnson said that he was positive that the defendant was not the robber. A police officer subsequently testified that the man in the photograph chosen by Johnson was the defendant.

Of particular concern to the present issue is the admission and weight of the following evidence: The identification of a picture by Johnson as being that of the robber; and the identification by the police officer of the picture as being that of the defendant.

An extrajudicial identification made by a witness may be offered in evidence for three possible purposes: (1) for corroboration; (2) for impeachment; or (3) as substantive evidence of an identification, having probative value. *Commonwealth* v. *Swenson*, 368 Mass. 268, 272 (1975). The extrajudicial identification may be used substantively even when the witness is unable or unwilling to make an in-court identification. *Id.* at 272, n.3. See *Commonwealth* v. *Fitzgerald*, *ante* 402, 408 (1978); *Commonwealth* v. *Torres*, 367 Mass. 737, 739 (1975). Cf. Fed. R. Evid. 801 (d) ("A statement is not hearsay if—(1) *Prior statement by witness*. The declarant testifies at the trial or hearing and

is subject to cross-examination concerning the statement, and the statement is . . . [C] one of identification of a person made after perceiving him"). Cf. Leach & Liacos, at 132-133. Assigning independent probative value to extrajudicial identification in such a situation is reasonable, we have noted, "particularly where the witness, because of the time lapse before trial, is unable to make an in-court identification but clearly recollects having positively identified the defendant earlier." *Commonwealth* v. *Swenson, supra* at 272 n.3.

The present case presents a closely analogous situation. The witness, Johnson, made a positive identification of the photograph soon after the robbery when the robber's image was fresh in his mind.[28] This mental image had faded by the time of trial to the point that Johnson testified he no longer remembered the robber but only remembered the picture. He testified that he had been positive of the extrajudicial identification, and he made a positive in-court identification of the same photograph. This testimony was properly admitted as independent evidence to be weighed, together with Johnson's in-court denial that the defendant was the robber, by the jury. Cf. *Commonwealth* v. *Fitzgerald, supra*.

The defendant argues that the police officer should not have been allowed to testify that, in his opinion, the photograph selected by Johnson depicted the defendant. He relies on *Commonwealth* v. *Nassar*, 351 Mass. 37, 41-42 (1966), in which we stated the rule, quoting from *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 137 (1875): "The competency of . . . [the opinion evidence of a nonexpert] rests upon two necessary conditions: first, that the subject matter to which the testimony relates cannot be re-

---

[28] The defendant had moved to suppress the extrajudicial identification on the grounds that the photographic array was suggestive and that the manner of presenting the photographs was suggestive. After hearing, the motion was denied, the defendant excepted, and error was assigned. The issue is not briefed, however, and thus we consider it waived. S.J.C. Rule 1 : 13, as amended, 366 Mass. 853 (1975).

produced or described to the jury precisely as it appeared to the witness at the time; and second, that the facts upon which the witness is called to express his opinion, are such as men in general are capable of comprehending and understanding." Both conditions were satisfied in the present case.[29] One police officer testified that he had known the defendant for a long time and had seen him often. The defendant testified that he had lost twenty to twenty-five pounds since the date of the robbery. The officer's testimony could therefore aid the jury in determining if the person whose picture had been taken sometime in the past was the same person who sat in the court room as the defendant.

Having concluded that the evidence linking the defendant to the extrajudicial identification by Johnson was admissible and carried independent probative value, we consider the question whether this evidence alone would be sufficient to withstand a motion for directed verdict. A motion for directed verdict raises the issue "whether there was sufficient evidence of the defendant's guilt to warrant the submission of the [case] to a jury." *Commonwealth* v. *Baron*, 356 Mass. 362, 365 (1969), quoting from *Commonwealth* v. *Altenhaus*, 317 Mass. 270, 271 (1944). *Commonwealth* v. *Clifford*, 374 Mass. 293, 296 (1978). As an appellate court, we consider "whether the evidence, read in a light most favorable to the Commonwealth, *Commonwealth* v. *Flynn*, 362 Mass. 455, 479 (1972), is sufficient so that the jury 'might properly draw infer-

---

[29] In *Nassar* we held it error to allow a prosecutor to state in his opening that a police officer thought that a photograph "looked like" a composite sketch of the defendant. We stated that "[s]ince the sketch and the photograph were in evidence, the opinion of the officer was inadmissible." *Id.* at 42. In *Commonwealth* v. *Locke*, 338 Mass. 682 (1959), however, testimony by an eyewitness, unable to identify either defendant in the court room, that certain facial characteristics in a photograph of one defendant resembled the features of the man who drove the get away car was deemed appropriate, where the photograph was put in evidence. The facts of the present case more closely resemble those of *Locke*.

ences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt.' *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933). *Commonwealth* v. *Gallagher*, 4 Mass. App. Ct. 661, 662 (1976)." *Commonwealth* v. *Clifford, supra* at 296.

Although there is authority to the contrary, see *People* v. *Gould*, 54 Cal. 2d 621, 631 (1960), we think that an extrajudicial identification may in an appropriate case provide a jury with a sufficient basis upon which to find a defendant guilty beyond a reasonable doubt. This conclusion is consistent with our observation that identifications made soon after the event are generally more reliable than identifications made at a much later date. *Commonwealth* v. *Swenson, supra* at 272 n.3. The instant case presents a good illustration of this proposition. See *Cousins* v. *State*, 18 Md. App. 552, 557 (1973). Cf. *Commonwealth* v. *Fitzgerald, supra* at 410 n.5.

3. For the reasons stated in part 1, *supra*, the judgment of the Superior Court must be reversed, the verdict set aside, and a new trial ordered.

*So ordered.*

QUIRICO, J. (concurring in the result). In deciding the case of *Commonwealth* v. *A Juvenile*, 365 Mass. 421 (1974), this court with three Justices dissenting, said at 426 that "if a defendant agrees in advance to the admission of the results of a polygraph test regardless of their outcome, the trial judge, after a close and searching inquiry into the qualifications of the examiner, the fitness of the defendant for such examination, and the methods utilized in conducting the tests, may, in the proper exercise of his discretion, admit the results, not as binding or conclusive evidence, but to be considered with all other evidence as to innocence or guilt."

In the present case the defendant agreed in advance to such a test and the admission of the results thereof. The trial judge made the required "close and searching inquiry" and then exercised his discretion by admitting evidence of the test results as part of the Commonwealth's case in chief. In doing so he rejected the contention of the defendant that such evidence may be admitted only for the limited purpose of impeaching the defendant and therefore only after he has testified. The judge imposed no limitations on the purposes for which the jury might consider the evidence.

Four of the Justices conclude that the judge committed error in admitting the evidence as part of the Commonwealth's case in chief, and they conclude further that the test results would be admissible for the limited purpose of impeaching the defendant if he testified. That is the view expressed in the opinion by Justice Liacos. Justice Kaplan states his concurrence therewith in a separate opinion, but "with misgivings as to whether the analysis would not justify rather more stringent limitations."

Two of the Justices who joined in the court's opinion in *Commonwealth* v. *A Juvenile, supra,* dissent in the present case, expressing the view that the defendant, having stated in writing before taking the test "that he agrees to allow the results of his polygraph examination to be admitted into evidence even if the results are unfavorable to him, and he waives his right against self-incrimination," should be held bound by his agreement.

I concur with the conclusion that it was error for the judge to admit the polygraph test results in evidence and with the order that judgment be reversed and a new trial ordered. However, I do not concur with the further conclusion that at any new trial the test results would be admissible even for the limited purpose of impeaching the defendant if he should testify. The reasons for my position are the same as those stated in my dissenting opinion, in which I was joined by Justices Reardon and Kaplan, in *Commonwealth* v. *A Juvenile, supra* at 441,

and those stated by Justice Kaplan in his dissenting opinion, in which Justice Reardon and I joined in the same case, at 452.

The door to the admissibility of evidence of polygraph test results was opened by this court, by a majority of one, in *Commonwealth* v. *A Juvenile, supra*, notwithstanding the following statement by the court, at 425 of that opinion: "In *Commonwealth* v. *Fatalo*, [346 Mass. 266 (1963)], we held that the results of polygraph tests were not admissible as evidence in a criminal case because the test had not yet achieved general acceptance by the scientific community as a reliable method for determining whether an individual is telling the truth. While not establishing universal scientific approval of a demonstration of infallibility as prerequisites to admissibility of polygraph test results, we felt that the results could not be admitted until the 'substantial doubts which presently revolve about the polygraph test' were resolved. 346 Mass. at 270. . . . Although we acknowledge that . . . scientific and legal developments [since the *Fatalo* decision] indicate that the polygraph is making progress in a hoped for evolution toward complete evidentiary recognition, we nevertheless are unwilling to say at this time that the standard in the *Fatalo* case has been met and that the polygraph test results should henceforth be subject to the same rules of evidence applicable to other forms of acceptable expert scientific evidence." Again, in deciding the present case, the court says, *supra* at 430-431, "Although the instant case and the *Moynihan* case indicate that the time has come to elaborate on the holding of *A Juvenile*, we emphasize that this is not an appropriate occasion to reexamine the type of factual questions presented to and considered by this court in *Fatalo* and *A Juvenile*. Specifically, no evidence has been submitted on the question of the scientific reliability or acceptability of the polygraph method. Rather, we accept as current and valid the finding of the court in *A Juvenile* that the 'general acceptance' standard of *Fatalo* has not yet been achieved."

Thus, fifteen years after the decision in *Fatalo*, and four years after the decision in *A Juvenile*, this court, in the opinion by Justice Liacos, still accepts "as current and valid the finding of the court in *A Juvenile* that the 'general acceptance' standard of *Fatalo* has not yet been achieved." Since "no evidence has been submitted [in the present case] on the question of the scientific reliability or acceptability of the polygraph method," it necessarily follows, in my opinion, that the evidence of polygraph tests was improperly admitted and that the defendant is entitled to a new trial.

The opinion by Justice Liacos contains a long and scholarly discussion of the limitations which should be placed on the use of this type of evidence. I do not disagree with the discussion, but I doubt its applicability to the present case in view of the total absence of evidence that the testimony in question meets the *Fatalo* test for admissibility. I am not content with simply limiting the purposes for which such evidence, if admitted, may be considered by the fact finders. I would (a) urge instead the reconsideration of our holding in *A Juvenile*, and (b) renew the suggestion that a study be undertaken by competent persons, under the auspices of the judiciary, the bar, the Legislature, or other appropriate bodies, to investigate and report on the question whether polygraph tests and the interpretation of the results thereof meet the *Fatalo* test, i.e., whether they have achieved general acceptance by the scientific community as a reliable method for determining whether an individual is telling the truth. Until that is attempted, I would not continue to hold out hope to defendants in criminal cases that there is any short cut to our approval of the use of polygraph test evidence, even for the limited purpose of impeachment or corroboration of testimony by the defendant.

KAPLAN, J. (concurring). When, in *Commonwealth v. A Juvenile*, 365 Mass. 421 (1974), the court was approving

the forensic use of polygraph results, thus departing from *Commonwealth* v. *Fatalo*, 346 Mass. 266 (1963), the dissenting Justices ventured to doubt that the question was best resolved by applying only the usual process of judicial lucubration. They suggested that a suitable team should be asked to undertake a study which, if favorable to the general idea of admitting evidence deriving from the polygraph technique, could propose court rules laying down definite limits and detailed procedures. There was another suggestion, that if the question was indeed to be answered solely through judicial decision, it would be peculiarly important to follow and in due course to describe and assess the consequences as they emerged in actual practice at the trial court level. I continue to regret that the opportunity for rule making was lost and no attempt at follow-up was inaugurated. Failing either kind of aid, caution is called for in the case by case elaboration of the subject, and in that light the main opinion herein has some considerable virtues. It describes certain features of the polygraph method which should discourage any routine acceptance of polygraph results, and on analysis it trims down the purposes for which those materials may be admitted in evidence. I concur, although with misgivings as to whether the analysis would not justify rather more stringent limitations.

BRAUCHER, J. (with whom Wilkins, J., joins, dissenting). In my view the defendant was fairly tried, and his conviction should be affirmed. I therefore dissent.

In *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 426 (1974), we held that "if a defendant agrees in advance to the admission of the results of a polygraph test regardless of their outcome, the trial judge, after a close and searching inquiry into the qualifications of the examiner, the fitness of the defendant for such examination, and the methods utilized in conducting the tests, may, in the proper exercise of his discretion, admit the results, not as

binding or conclusive evidence, but to be considered with all other evidence as to innocence or guilt."

Pursuant to that holding, the defendant moved that the Superior Court allow him to take a polygraph examination at the expense of the Commonwealth "for the purpose of introducing its results into evidence at this trial." The defendant personally signed an agreement "to allow the results of his polygraph examination to be admitted into evidence even if the results are unfavorable to him," and a waiver of "his right against self-incrimination." The judge allowed the motion, and there is no contention that he did not make the required "close and searching inquiry."

The defendant took the examination, and the results were unfavorable to him. Relying on our decision, the prosecutor offered the results in evidence, the judge exercised his discretion to admit them, and the jury found the defendant guilty. Now the court holds that we did not mean what we said, and that the defendant should be relieved of his agreement, largely on the basis of considerations advanced in the dissenting opinions in *Commonwealth* v. *A Juvenile, supra.*

My disagreement is on a narrow ground. I fully agree that there are often difficulties with the reliability of polygraphic evidence, as indeed there are with many of the types of evidence on which we customarily rely. If the trial judge had excluded the evidence, there would of course have been no appellate review, whatever the outcome of the trial. Likewise, if he had limited the evidence to impeachment of the defendant's testimony, as the defendant requested, there would be no reversible error. But the judge did neither. In my view we act unwisely when we substitute our judgment for his on a matter that he understood far better than we can. Even more unwise is the substitution of an arbitrary rule for the exercise of sound judgment, particularly when the arbitrary rule rests on factual considerations of dubious standing, deduced from selected fragments of the highly controversial

literature on the subject, unsupported by anything in the record.

Particularly troublesome is the implicit suggestion that the defendant, as matter of right, must be relieved of his agreement because the "limited probative value" of the evidence is outweighed by "confusion and prejudice of the jury; intrusion into jury function; and use of trial resources." The evidence in question is evidence of the pretrial words, conduct, and condition of the defendant, relevant to his guilt. Such evidence is traditionally admissible against him on the issue of guilt or innocence, once he has waived his privilege not to be a witness against himself. It is not ordinarily the function of an appellate court to balance the probative value of the defendant's relevant admissions against possibilities of confusion and the like in deciding whether evidence of the admissions is admissible. Such balancing on appeal is not only likely to produce confusion and uncertainty; it invades the province of the jury and the trial judge.