COMMONWEALTH *vs.* EDWARD B. ELLIS.

Berkshire.  October 7, 1981. — November 18, 1981.

Present: BROWN, CUTTER, & DREBEN, JJ.

*Practice, Criminal,* Severance.  *Search and Seizure,* Standing to object,
  Automobile, Inventory.

There was no violation of Mass.R.Crim.P. 9 in the trial of a defendant
  on charges of attempted extortion together with charges of possession
  of a controlled substance with intent to distribute where the trial judge
  was warranted in viewing all the offenses as arising out of the same
  course of criminal conduct and where the defendant did not seek relief
  from prejudicial joinder before trial. [618-621]
In the circumstances, a criminal defendant did not have standing to object
  to the search of an automobile rented by an associate of the defendant
  from a company leasing automobiles. [622-624]

INDICTMENTS found and returned in the Superior Court
Department on April 9, 1980, and May 6, 1980.

The cases were tried before *Simons, J.,* and a motion for a
new trial was heard by him.

*Morris M. Goldings* for the defendant.

*Daniel A. Ford,* Assistant District Attorney, for the Com-
monwealth.

CUTTER, J.  Ellis was charged on six indictments.  Four
alleged attempted extortion from Peter Corbin on separate
dates, in late 1979 and early 1980.  The others charged pos-
session of a class B controlled substance (cocaine) with in-
tent to distribute, and possession of a class D controlled sub-
stance (marihuana).  A motion to suppress certain items
found in taking an inventory (partly without a warrant) of
the contents of a rented automobile was denied after hear-
ing.  The cases were tried together in November, 1980. Ellis
was found guilty on the charge of possession of cocaine with
intent to distribute the same, and on the four charges of

attempted extortion. He was found not guilty on the charge of possession of marihuana. Ellis has appealed from the convictions and from the denial of a motion for a new trial. There was evidence from which the jury reasonably could have found the circumstances to have been as outlined in the following paragraphs designated (A) to (R).

(A) In 1979, Peter Corbin needed financing for a dance club in Williamstown to be known as Rollo's Disco. After negotiations, financing of $40,000 was provided by Ellis for which he was to receive twenty percent of the stock of a corporation to be formed (Rollo's, Inc.) to operate the club and twenty percent of most payments made by Rollo's, Inc., to Corbin and certain members of his family. On May 4, 1979, Ellis delivered to Corbin and his attorneys $40,000 in cash.

(B) Rollo's opened on July 1, 1979. A manager was hired. Corbin himself worked at Rollo's part time, as well as in various capacities at another "family business," a restaurant known as The British Maid, across the street from Rollo's.

(C) In August, 1979, Ellis came to Rollo's and told Corbin "he was wondering when he would get any money." Corbin told Ellis that "the place [Rollo's] had not yet made anything." Corbin had received a few wage checks (about $1,000 in all) from Rollo's, Inc., but was paid principally by The British Maid, which paid "everyone who . . . worked at Rollo's . . . until Rollo's got on its feet." Ellis continued to tell Corbin of his concern at not receiving any money from Rollo's. On one occasion Ellis accused Corbin of taking all the money and said that "if it continued, he would really think of cutting . . . [Corbin's] throat."

(D) In October, Ellis told Corbin that the latter was treating the situation "much too lightly" and that he (Ellis) had Boston friends "who would just love to throw dynamite in the building." He added that the "British Maid would burn real well because it was so old, and if he didn't get paid, he was going to put . . . [Corbin] out of business." In October, after a conference with Ellis, Corbin discovered that his truck tires all had been cut. In another conversation,

Ellis told Corbin that he was so annoyed "he decided to put some money down on a contract on . . . [Corbin] in Miami" to make Corbin realize that the situation was "serious" so that the latter would "come up with some money."

(E) About November 14, 1979, Corbin and Ellis met at the office of Corbin's attorneys. A new agreement was executed by which Corbin then paid Ellis $20,000, and undertook to pay $25,000 more (including $5,000 as a "lender's fee or interest") to Ellis on or before January 18, 1980, in exchange for a release of all Ellis's interest in Rollo's, Inc., and its assets and real estate.

(F) At some time after signing the new agreement, Ellis told Corbin that he "was looking at a very short life" and that, if he did not pay Ellis, Ellis was going to make Corbin and his family "incredibly sad" and that Corbin "might be in the hospital, if . . . lucky, the rest of . . . [his] life." The $25,000 was not paid by January 18, 1980.

(G) In December, 1979, Corbin had a telephone talk with Ellis, then in Miami, which Corbin "taped" with a portable tape recorder. The talk contains thinly veiled threats of "very serious after effects" of any failure by Corbin to make further payments. On January 31, 1980, Corbin paid Ellis an additional $10,000. Ellis again called Corbin by telephone in March, 1980, to ask whether Corbin would have $15,000 for him when he came to Williamstown "with two associates from Miami." Corbin replied that he would not. Ellis then said that if Corbin did not have the money he (Ellis) was "going to walk out," leaving Corbin to deal with Ellis's two associates. A telegram to Corbin from Ellis in Hollywood, Florida, dated March 25, 1980, confirmed that Ellis would "be arriving before the week-end with Miami associates. Expecting payment in full."

(H) Ellis left Florida soon after talking with Charles R. Whiteman, a resident of Williamstown, who on March 25, 1980, was at his apartment in Miami Lakes, Florida. Whiteman had known Ellis for about four years. He had done Ellis various favors and had lent him, interest free, substantial sums of money which had been repaid. They for some

time had shared a house rented by Whiteman. In any event they arranged to go to Williamstown from Boston together.[1] They went to Boston separately and met in Ellis's room in a Boston hotel. Whiteman told Ellis that he had some drugs to pick up. On the next day in Boston Whiteman obtained on credit a substantial amount of cocaine, worth by Whiteman's estimate at least $66,000 "on the street" and, appropriately "cut" possibly worth as much as $420,000. Whiteman showed the cocaine to Ellis who said "he thought he knew a few people who might" buy it. For this help Ellis was to have cancelled any obligation to repay some money lent to him by Whiteman. Subsequently, Ellis talked, in Whiteman's presence, with one person about the possibility of selling the cocaine and with at least one other who did not want to become involved.

(I) Ellis unsuccessfully tried to rent from the Hertz Company a 1980 Cadillac Seville automobile and asked Whiteman for assistance. Whiteman (in the absence of Ellis) then rented, in his own name, from Hertz a new Cadillac.

(J) On March 28, Ellis and Whiteman drove the rented automobile to Cambridge and picked up Anthony Owens, a "big" man about thirty years old, six feet six inches tall.[2] The cocaine was then in the trunk of the Cadillac where Whiteman had placed it in a zipper bag purchased by him in Florida. With Ellis driving, they proceeded to an inn in North Adams.

(K) On the trip, Whiteman was sniffing cocaine and let Owens (who was told by Whiteman that it was in the trunk) try some. Whiteman also gave Ellis $4,000 in cash, because

---

[1] Ellis was "to receive some money from . . . Corbin in Rollo's" and Whiteman testified that he planned to pick up his automobile then in a body shop in Williamstown.

[2] Owens did not testify at Ellis's trial, but a photograph of him was introduced, described at a bench conference as making Owens "look evil." In the summer of 1979, Corbin had seen Owens with Ellis once before at The British Maid. No explanation of Owens's presence appears and an inference would have been reasonable that Owens was, and that Whiteman should have realized that he was, brought along to intimidate Corbin.

Ellis "wanted to have some money to flash around." At the hotel, Owens and Whiteman had a drink at the bar. Ellis left them and soon returned to give them "a couple of room keys." They all then drove to Rollo's in Williamstown where Ellis expected to receive from Corbin the $15,000 final payment. Ellis had mentioned this earlier in Boston, although Whiteman denied in his testimony that he knew "any threat was to be made to Corbin," evidence which the jury was not required to believe.

(L) Corbin had been greatly upset by his telephone talks with Ellis and shortly prior to March 28, had told his attorney about them. The police had been notified and four officers were across the street or in or near Rollo's Disco on the evening of March 28. About 11:30 P.M. Ellis, Owens, and Whiteman drove up in the Cadillac, with Ellis driving. Ellis parked the automobile under the canopy at the entrance to the disco. They walked inside. The officers waited outside the front entrance. Corbin was tending bar. Owens sat down near the bar talking with Ellis, but looked at Corbin "for a period of about twenty seconds with a straight eye to eye stare."

(M) At some stage, Ellis and Whiteman went into the office to use the telephone. Ellis came back alone, found that Corbin was busy, and went outside. There he was arrested by State Trooper Mott after some conversation with a local police officer named Morin. The State police, upon a complaint by Corbin, had obtained a warrant for Ellis's arrest. Whiteman met two friends as he entered the disco and went with them to another bar from which he returned after about a half hour. Before Whiteman left for the other bar, Ellis had told him that he wanted to keep the Cadillac with him. Thus, Ellis was in possession of the automobile keys.

(N) After Ellis had been handcuffed, he asked Officer Morin, whom Ellis had known for some time, to remove the Cadillac's keys from Ellis's jacket pocket and give them to Whiteman. Ellis made no objection to Officer Morin concerning moving the automobile or to his taking the keys. Later, Officer Morin talked with Whiteman at the Wil-

liamstown police station. Whiteman did not want to have the new Cadillac towed and gave Officer Morin permission to drive it to a garage. Officer Morin then moved the automobile to Grudney's Garage (owned by the officer), which on occasion was used by the Williamstown police for storage of certain motor vehicles involved in accidents and for inventory searches of vehicles. Owens and Whiteman also were arrested that evening.

(O) At the garage Officer Morin and Special Officer Paul Thompson made an inventory of the automobile's contents which started at the front of the automobile and went back. Underneath the front seat, among other items, were found in a paper bag three vials of manritol, a substance often used to "cut cocaine," a mortar and pestle, and a small rubber-type tourniquet, as well as a check book and driver's license in Ellis's name. In the glove compartment were registration and other papers from Hertz Rent-a-Car, and traces of a white powder inside the glove compartment door. In the rear seat were found various items of costly photographic equipment, a package of personal papers, and a plastic bag containing a substance. In the pouch back of the front seat was found a smoking pipe with a residue and a steel bowl with white residue. In the automobile trunk was a Samsonite brown case with a zipper more than half closed. In that case, among other items, were two plastic bags containing a white substance. Throughout the automobile were items of clothing and personal effects not now relevant. Various items found were not opened, such as bags containing photographic equipment, a black disc container found in the glove compartment, and the package of personal papers. This search is more fully described below in discussing the motion to suppress.

(P) Following this initial inventory action, Trooper Flaherty of the State Police and Officer Morin obtained a search warrant. They opened the black disc container which was found to contain a white powder and they scraped up some white powder from the creases of the driver's side of the front seat. All the white powder, tested

by a State laboratory, was analyzed as cocaine. The residue in the pipe and the contents of the plastic bag lying on the back seat were found to be marihuana.

(Q) On April 23, 1980, Ellis called Corbin by telephone and said that Cubans, who apparently had let Whiteman have the cocaine on credit, see par. (H), *supra*, had been upset by the loss of the cocaine and were "about to have . . . [Corbin] done up." Ellis said he alone could save Corbin, if he would "come up with the other ten grand." Later, on September 18, 1980, Ellis saw Corbin at a North Adams garage and said that the Cubans were going to wait until after the trial of the case against Ellis and "blow . . . [Corbin] away after that."

(R) During trial, Whiteman had negotiations through his counsel with the office of the district attorney. It was disclosed to the jury that Whiteman was to be allowed to plead guilty to a charge of intimidating a witness and had been adjudicated a drug dependent person so that, if certified that he could be aided by treatment, he could be assigned to a treatment center. In any event, Whiteman thereafter gave a long statement to the district attorney and, called by the prosecution, gave testimony at Ellis's trial.

1. Ellis's first contention is that he was tried in the Superior Court on unrelated offenses without his written consent in violation of Mass.R.Crim.P. 9,[3] 378 Mass. 859 (1979). We perceive no such violation.

---

[3] Rule 9 reads in part (emphasis in text, other than headings, supplied):

"(a) JOINDER OF OFFENSES.

"(1) *Related Offenses.* Two or more offenses are related offenses if they are based on the same criminal conduct or episode or arise out of a *course of criminal conduct* or *series of criminal episodes connected together* or constituting parts of a single scheme or plan.

"(2) *Joinder of Related Offenses in Complaint or Indictment.* If two or more related offenses are of the same or similar character, they may be charged in the same indictment or complaint, with each offense stated in a separate count.

"(3) *Joinder of Related Offenses for Trial.* If a defendant is charged with two or more related offenses, either party may move for joinder of such charges. . . .

Improper joinder of offenses was not made an issue at trial in any way. No written motion in behalf of Ellis for relief from allegedly prejudicial joinder was filed before trial pursuant to rule 9(d)(2). The issue was first raised (by new counsel) on a motion for a new trial before the judge who had heard the motion to suppress and who had presided at the trial.[4]

The trial judge, in rejecting Ellis's contention, pointed out that at trial the Commonwealth had taken the position that Whiteman was the "principal possessor of the" cocaine and that Ellis's involvement "was only on the basis of a joint venture in that he had . . . [undertaken] to assist in the proposed sale." The judge expressly found that "the various

---

"(4) *Joinder of Unrelated offenses.* Upon the *written motion of a defendant, or with his written consent,* the trial judge may join for trial two or more charges of *unrelated* offenses upon a showing that failure to try the charges together would constitute harassment or unduly consume the time or resources of the parties. The trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice.

"(b) JOINDER OF DEFENDANTS. Two or more defendants may be joined in the same indictment or complaint if the charges against them arise out of the same criminal conduct or episode or *out of a course of criminal conduct* or *series of criminal episodes so connected as to constitute parts of a single* scheme, plan, conspiracy or *joint enterprise. . . .*

"(c) CONSOLIDATION OF OFFENSES OR DEFENDANTS ON MOTION OF COURT. The trial judge may order two or more indictments or complaints to be tried together if the offenses and the defendants, if more than one, could have been joined in a single indictment or complaint.

"(d) RELIEF FROM PREJUDICIAL JOINDER.
". . . .

"(2) *Motion by the Defendant. A motion of the defendant for relief from prejudicial joinder shall be in writing and made before trial* and shall be supported by an affidavit setting forth the grounds upon which any alleged prejudice rests, except that a motion for severance may be made before or at the close of all the evidence if based upon a ground not previously known.

"(e) CONSPIRACY. An indictment or complaint for conspiracy to commit a substantive offense shall not be tried simultaneously with an indictment or complaint for the commission of the substantive offense, unless the *defendant moves for joinder* of such charges pursuant to subdivision (a) of this rule."

[4] At trial, Ellis had been represented by two mature attorneys, one of whom had substantial experience in the defense of felony prosecutions.

indictments would have to be proved by substantially the same evidence arising out of the continuous series of acts unbroken in time." This finding was wholly warranted by the evidence, see pars. (H), (I), (J), and (K) of the statement of facts above, which revealed (a) the close relationship between Ellis and Whiteman over a period of four years, (b) Whiteman's knowledge that Ellis was trying to collect money from Corbin, (c) Ellis's willingness to participate with Whiteman in disposing of the cocaine, (d) the joint participation in the drive to Williamstown under the guidance of Ellis, and (e) Ellis's threatening conversation with Corbin on April 23, 1980, describing the annoyance of unidentified Cubans at the loss of the valuable cocaine which they had entrusted to Whiteman. See par. (Q) of statement of facts, *supra.*

The trial judge was warranted in viewing all the offenses with which Ellis was charged as arising out of the same "course of criminal conduct." The judge reasonably could have inferred that this had begun in Miami and ended with the Williamstown arrests on March 28. Much the same evidence was needed to prove each of the charges against Ellis. The case appears within the general scope of pertinent authorities sustaining joint trials without a defendant's consent or the refusal of a defendant's motion to sever offenses. *Commonwealth* v. *Cruz,* 373 Mass. 676, 690-691 (1977). *Commonwealth* v. *Cullinan,* 9 Mass. App. Ct. 895 (1980). Severance of offenses is largely a matter in the discretion of the trial judge in the light of the particular facts before him. See *Commonwealth* v. *Jervis,* 368 Mass. 638 (1975), which (at 645) distinguishes from cases like that before us the decision in *Commonwealth* v. *Blow,* 362 Mass. 196, 200-201 (1972), on the ground that in the *Blow* case "there was no single course of conduct in the several offenses charged nor was there any proof of guilt by substantially the same evidence."[5]

_____

[5] In general to similar effect are *United States* v. *Abshire,* 471 F.2d 116, 118-119 (5th Cir. 1972); *United States* v. *Pietras,* 501 F.2d 182, 185 (8th

Ellis contends that Mass.R.Crim.P. 9 (see note 3, *supra*) is more explicit than the comparable Federal rule, Fed.R. Crim.P. 8(a), in that rule 9 requires the consent of the defendant to the joinder for trial of "unrelated" offenses. The definition of "related" offenses in Massachusetts rule 9(a)(1) is not shown to be materially different in impact from that in the similar Federal rule 8(a). If the offenses are "related" within the meaning of the rules, joinder for trial under the Massachusetts rule, as well as under Federal rule 8(a), requires no consent by the defendant. See rule 9, pars. (a)(2) and (a)(3), and (b). It is only where the offenses are "unrelated" within the meaning of the Massachusetts rule that the defendant's written consent or motion may be necessary. We follow the broad interpretation, in decisions already cited, of the terms in rule 9(a)(1), "same criminal conduct" and "course of criminal conduct . . . connected together."

The provisions of Mass.R.Crim.P. 9(d)(2) require that a defendant, desiring severance as "relief from [alleged] prejudicial joinder" file a written motion "before trial" with an exception not here pertinent. There is no showing here that the facts concerning the offenses charged were not known to Ellis's trial counsel before trial, or of any other reason for relieving Ellis of the obligation to file a written motion before trial. See Reporters' Notes to Mass.R.Crim.P. 9, Mass. Ann. Laws, Rules of Criminal Procedure at 135 (1979). See also *United States* v. *Quinones*, 516 F.2d at 1312, 8 Moore's Federal Practice § 14.02[2], at 14-11 – 14-12 (2d ed. 1981 rev.), and cases cited in 1 Wright, Federal Practice and Procedure §§ 221 and 222 (1969 & 1980 Supp.). We perceive nothing in the evidence at trial showing prejudice to Ellis of a character requiring the trial judge to act *sua sponte.*

Cir.), cert. denied, 419 U.S. 1071 (1974); *United States* v. *Quinones,* 516 F.2d 1309, 1312 (1st Cir.), cert. denied, 423 U.S. 852 (1975); *United States* v. *Park,* 531 F.2d 754, 760-763 (5th Cir. 1976); *United States* v. *Ritch,* 583 F.2d 1179, 1180-1182 (1st Cir.), cert. denied, 439 U.S. 970 (1978). See cases collected in 1 Wright, Federal Practice and Procedure, Criminal, § 143 (1969 & 1980 Supp.).

2. Ellis's second contention is that the trial judge should have allowed the motion to suppress items found in taking an inventory of the Cadillac's contents. On the motion to suppress, the trial judge made the following findings, among others, upon the evidence at the hearing on the motion: (a) When arrested outside Rollo's Disco, Ellis "told the arresting officers that the Cadillac was not his" and asked them "to take the keys from his pocket" and give them to Whiteman, the lessee of the automobile from Hertz, see par. (N) of the statement of facts, *supra*. (b) The Williamstown police department "had a long standing policy . . . to inventory all property taken into custody." The inventory policy was to protect "the owner as well as the police officers from any claim for missing . . . property." (c) Whiteman indicated that the Cadillac might "be moved to a nearby garage, provided that it was driven with the garage's repair registration plates so as not to jeopardize . . . [Whiteman's] insurance." (d) In their initial search, after listing clothing and camera equipment inside the body of the automobile, "they opened the trunk and saw a partially unzipped leather travel case" inside of which "they found a Vermont license plate [which had been issued to Whiteman] and two plastic bags with a white substance which led them to believe the contents were cocaine."[6] After finding the drug paraphernalia mentioned in par. (O) of the statement of facts, *supra*, the officers "conducted a field test on the white substance, determined it to be cocaine," and applied for a search warrant. On these and related findings, the judge found (a) that because Ellis was "neither owner nor lessee" of the Hertz Cadillac, he had "no standing to

---

[6] The evidence about the zipper bag on the motion to suppress was in somewhat greater detail than that at trial, summarized *supra*. Officer Morin testified; "This . . . bag was . . . in plain view. There were two handles on it. I grabbed the handle, took it out . . ., set it down, and the bag was open . . . . It would be like a bowling bag. The zipper goes up and around . . . [and] was half way unzipped." It was, he testified "sort of a leather bag, zipper on the top, which . . . went through both handles."

object to the search of the automobile"; (b) that the inventory "was justified by the fact that expensive camera equipment was . . . in plain view" and by the long established Williamstown police practice; and (c) that until the discovery of the narcotics the focus of the investigation was on the alleged extortion and not on narcotics activity. The judge's findings on the evidence on the motion to suppress are consistent with the evidence at trial summarized above in the statement of facts, pars. (N), (O), and (P).

We note the following additional considerations:

(a) Ellis was not the owner or lessee of the Cadillac or, so far as appears, of any property found in the automobile's trunk. He was not shown to have had any interest in such property (except on the theory of possession of the cocaine as a joint venturer). He did not place the cocaine in the trunk, and seems to have treated it as Whiteman's property. Under the recent cases, he lacked standing to object to the search of the trunk because, in the circumstances, he had no expectation of privacy for the contents of a zipper bag which did not belong to him. See *Rakas* v. *Illinois*, 439 U.S. 128, 148-150 and 150-156 (1978) (Powell, J. concurring); *United States* v. *Salvucci*, 448 U.S. 83, 86-95 (1980). See also *Rawlings* v. *Kentucky*, 448 U.S. 98, 104-106 (1980); *United States* v. *Goshorn*, 628 F.2d 697, 700-701 (1st Cir. 1980).

(b) The finding that this inventory was of a type called for by the Williamstown police policy was warranted as was the finding that expensive cameras were in plain view on the rear seat of the Cadillac. The evidence on the motion to suppress did not show that any locked piece of luggage was searched before a warrant was obtained. The present somewhat uncertain status of inventories of this type is noted in the margin.[7] In any event, the zipper bag, if viewed

---

[7] *Cady* v. *Dombrowski*, 413 U.S. 433, 442-448 (1973), and *South Dakota* v. *Opperman*, 428 U.S. 364, 369-384 (1976), can no longer be relied on as establishing without qualification the occasions when an inventory examination is proper and its permissible scope. These decisions have been affected in some measure, at least with respect to locked luggage and sealed parcels and containers. See *United States* v. *Chadwick*, 433 U.S. 1,

as luggage, was clearly the property of Whiteman and its contents were primarily his or in his possession. Whiteman does not appear to have placed any limits on the use of the keys to the Cadillac or to have objected in his own behalf to the search at any time.

4. We hold that Ellis in the circumstances had no standing to object to the search of the trunk. A majority of the panel take the view that we need not consider whether this inventory was valid. The author is of opinion that the police conduct, shown by the evidence on the motion to suppress, meets the standards of those decisions (see note 7, *supra*) permitting such inventories.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*

---

12-16 (1977); *Arkansas* v. *Sanders,* 442 U.S. 753, 757-766 (1979); *Robbins* v. *California,* 453 U.S. 420, 423-428 (1981); *New York* v. *Belton,* 453 U.S. 454, 457-462 (1981). Cf. *Harris* v. *United States,* 390 U.S. 234, 236 (1968). Most of the Massachusetts decisions are not directed very clearly to situations such as that before us. See *Commonwealth* v. *White,* 374 Mass. 132, 140-141 (1977); *Commonwealth* v. *Benoit,* 382 Mass. 210, 213-214, 219-220 (1981), where (at 219) it is said, of a warrantless search, that if it "is to be recognized as a lawful inventory search, there must be at least a showing that it was conducted for some legitimate police purpose other than a search for evidence." See, however, *Commonwealth* v. *Tisserand,* 5 Mass. App. Ct. 383, 386-387 (1977). See also *United States* v. *Dall,* 608 F.2d 910, 913-915 (1st Cir. 1979); *United States* v. *Markland,* 635 F.2d 174, 176-177 (2d Cir. 1980). Compare *United States* v. *Wilson,* 636 F.2d 1161, 1162-1166 (8th Cir. 1980; temporary custody of vehicle alone intended); *Commonwealth* v. *Moon,* 380 Mass. 751, 760-761 (1980); *Commonwealth* v. *Woodman,* 11 Mass. App. Ct. 965, 966 (1981). Until there is clarification of the present somewhat confused state of the decisions, police may be wise to obtain a warrant before taking an inventory, upon a showing that one is reasonable for a legitimate police purpose.