COMMONWEALTH vs. JAMES CAPPELLANO.

Suffolk. November 9, 1983. — December 20, 1983.

Present: GRANT, CUTTER, & DREBEN, JJ.

*Identification. Evidence,* Identification, Testimony of third party respecting identification, Impeachment of credibility, Conflicting statements of witness. *Practice, Criminal,* Severance.

Where a victim in two shooting incidents proved to be a "vague and forgetful" witness at the trial of indictments arising from the incidents, the judge, in the circumstances, correctly ruled that two of the victim's pretrial statements, which, during a voir dire he admitted having made, and which were reasonably found to have been adopted by him in his testimony before the jury, were admissible as substantive evidence of the defendant's guilt. [275-278]

Where a victim in two shooting incidents proved to be a "vague and forgetful" witness at the trial of indictments arising from the incidents, there was enough potential inconsistency between the victim's general testimony and his pretrial statements to third persons, including a police detective to whom he had identified the defendant as his assailant and explained his failure to report one of the incidents, to justify the judge's allowing the pretrial statements in evidence for impeachment purposes. [278-279]

Evidence at the trial of indictments arising from two shooting incidents was sufficient to warrant denial of a motion for required findings of not guilty. [279]

Two groups of indictments arising from separate shooting incidents involving the same victim, with whom the defendant had had a close personal and business relationship, were appropriately tried together, where the judge was warranted in concluding that the connection between the two episodes outweighed whatever prejudice might result from joinder for trial. [279-282]

INDICTMENTS found and returned in the Superior Court Department on March 13, 1981.

The cases were tried before *John Paul Sullivan,* J.

*John J. Barter (Andrew Good* with him) for the defendant.

*Ellen M. Donahue,* Assistant District Attorney (*John V. Mahoney,* Assistant District Attorney with her) for the Commonwealth.

CUTTER, J. Cappellano was found guilty on nine indictments[1] based upon two shooting incidents, one on November 4, 1980, and the other on January 22, 1981. The trial judge denied a motion to sever trial of the indictments based upon the events of January 22, 1981, from the trial of those indictments based upon events taking place on November 4, 1980. Cappellano presents on appeal not only the denial of this severance motion but also issues of the admission of evidence concerning the events of January 22, 1981, and the denial of Cappellano's motion for a required finding on charges arising out of the several events. On the evidence, the jury could have found the facts set out below.

A. *The Attacks of November 4, 1980.* Bradley Carter was a friend, and for several years the partner, of Cappellano in the ownership of two barrooms and other enterprises. Cappellano, armed with a gun and a knife, awakened Carter in Carter's apartment (owned by Cappellano's parents) about 7:45 A.M. on November 4, 1980. He said to Carter, "Get up, I'm going to kill you." During the next few minutes, Cappellano told Carter that one Brian Morrison was one of a group "that . . . were out to kill him" (Cappellano). Cappellano, a short time before November 4, had accused Morrison of "seeing" the former's girl friend and, during a fist fight, had caused substantial injuries to Morrison. On November 4, he asked Carter to call Morrison and get him to come to the apartment. Carter avoided making the telephone call and then was directed at gun point to drive a short distance in Carter's distinctive ancient automobile to a building on East Third Street, South Boston. During the ride Cappellano fired a shot into the automobile's dashboard.

[1] The indictments were: (1) *November 4 episode.* Assault with intent to murder Robert Petrie and assault and battery upon him, assault with intent to murder James Bernardi and assault and battery upon him, assault upon Judy Avery, and unlawful possession of a handgun; (2) *January 22 episode.* Assault with intent to murder Bradley R. Carter and assault and battery upon him, and unlawful possession of a handgun.

They left the automobile and went upstairs with Cappellano's gun pointed at Carter's head. James Bernardi was at the third floor landing. Cappellano went around Carter and ran up the stairs. Carter escaped to the street where he heard shots and screams coming from the third floor. He promptly reported to the police that his automobile had been stolen, but did not report the shooting he had heard when outside the East Third Street building.

On the third floor of that building, in an apartment where Brian Morrison also had been living, Cappellano fired three shots at Bernardi, one of which shattered his arm. Bernardi fell to the floor and "played dead." Cappellano then moved toward the bedroom usually occupied by Morrison. Bernardi heard two shots from the bedroom, which (in the absence of Morrison) was occupied by Robert Petrie and his "girl friend." Cappellano shot Petrie twice, once in the shoulder and once in the stomach and threatened Petrie's girl friend. Cappellano then went off down the stairs and left the building. Petrie and Bernardi were taken to Boston City Hospital, where each underwent substantial surgery.

Complaints issued against Cappellano, who was not arrested until December 23, 1980, when he turned himself in to the police. At his arraignment, the case was continued until January 29, 1981. Cappellano was released on bail.

B. *The Attack on Carter on January 22, 1981.* On January 22, 1981, Carter was awakened about 8:45 A.M. The door to his bedroom was thrown open violently by a large man approximately six feet tall and weighing 250 pounds.[2] The large man began shooting at Carter and at least eleven bullets hit him, of which eight or nine still remain in his body. He sustained multiple and serious wounds. He fell from his bed and ended with the side of his head in a waste basket.

---

[2] Cappellano was six feet, one or two inches, tall and his weight "varied over the years." It was open, of course, to the jury to observe him as defendant during the trial.

1. *Early statements by Carter.*  At trial, Carter became a vague and forgetful witness (and could be thought by jurors hearing his whole testimony to be an evasive witness), especially with respect to the events of January 22.  Asked if he saw in the courtroom the man who had shot him on the 22d, he replied, "I'm not able to determine that . . . . I can't know for sure just what the person looked like."  In answer to inquiry whether Cappellano had shot him, he replied, "I don't know that for sure."  He testified that he asked a young girl, Joanne Waldron, then in the apartment, to call her mother, who lived across the street, to come to the apartment.  He claimed to be unable to remember a conversation[3] with Mrs. Waldron, the mother, when she appeared.

The trial judge, with the jury absent, allowed a voir dire examination of Carter.  In the course of that, the witness was asked about a conference with police officers (including Sergeant Detective Laurence McNamara) while in the emergency room at Boston City Hospital.  He conceded by the interchange reproduced in the margin[4] that he had told the officers that Cappellano had shot him.  As to other conversations in the hospital with officers, within a few days of the shooting, Carter claimed that he had no "recollection . . . of those early days . . . other than a lot of pain."

Inquiry was also made of Carter on voir dire about a conversation with the assistant district attorney in the latter's office on June 3, 1981, only four and one-half months after Carter had been attacked.  Carter conceded that he then

---

[3] The prosecutor had suggested in a bench conference that the conversation would show that Carter then identified Cappellano as his attacker. The mother, however, was never called as a witness.

[4] "Q . . . . [W]ould you give us the substance of the conversation that you had with them.  What did you say and what did they say?  A . . . . [T]hey asked me who had shot me, and I replied that I thought it was James Cappellano.  Q.  Do you recall saying 'Jimmy Cappelino' at that time?  A.  I would never say that.  His name is Cappellano.  Q. Assuming that the officer didn't quite make out the sound of the last name, did you say 'Jimmy Cappellano shot me'?  A.  Yes."

had told the prosecutor that Cappellano was his assailant.[5] On cross-examination Carter was much more equivocal, and on the next day Carter, in testimony before the jury, denied any recollection of the conversation in the hospital emergency room, even when confronted with his testimony (see note 4, *supra*) the day before on voir dire. Carter in substance, however, admitted that his voir dire testimony the day before, given under oath, was to the best of his knowledge correct, and the judge ruled reasonably that his testimony before the jury had "adopted" his testimony on voir dire. Sergeant McNamara testified that in the emergency room conversation with Carter on January 22, the latter had told him that "Jimmy Cappalino" had shot him.

Carter, before the jury, was asked concerning his conference of June 3, 1981, with the assistant district attorney, "Who did you identify on that day to me as the man who shot you?" The answer was "Mr. Cappellano."

The trial judge correctly ruled that these two of Carter's early statements (i.e., the January 22 statement in the emergency room and the June 3 statement to the prosecutor) identifying Cappellano as his attacker on January 22, were admissible as substantive evidence of his guilt. These were to be weighed by the jury with all other evidence including, of course, Carter's equivocal testimony on cross-examination.

In *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 408 (1978), it was said that "out-of-court identifications may be admitted as substantive evidence of guilt as long as the defendant's due process and confrontation rights are satisfied." In the *Fitzgerald* case, a witness (obviously, see 409, hostile to the prosecution's position) "did not deny that she had previously identified photographs of" the then defendants or state "that she could not recall" doing so. It was held, in view of the availability of the witness for cross-

---

[5] The colloquy on voir dire in part was:
"Q. And on that occasion you were quite specific in identifying James Cappellano as the man who shot you, weren't you? A. The terms of that conversation that we had, the presumption at that time was that, yes, Mr. Cappellano had shot me. Q. And that's what you told me that day, isn't it? A. Yes, it is. Q. That Cappellano was the man who shot you; right? A. Yes."

examination, that "the admission of the [photographic] identifications as substantive evidence did not violate the [then] defendants' right of confrontation." *Ibid.* See to the same effect *Commonwealth* v. *Torres,* 367 Mass. 737, 738-742 (1975), where a pretrial out-of-court voice identification of the defendant by a blind woman was admitted as substantive evidence of guilt although there was no such in-court identification; *Commonwealth* v. *Vitello,* 376 Mass. 426, 457-461 (1978), out-of-court photographic identification (see 458) "may be used substantively even when the witness is unable or unwilling to make an in-court identification" and (at 461) may "provide a jury with a sufficient basis upon which to find a defendant guilty beyond a reasonable doubt." See also the discussion in *Commonwealth* v. *Swenson,* 368 Mass. 268, 272 n.3 (1975); Liacos, Massachusetts Evidence 170-171, 245-247 (5th ed. 1981 & Supp. 1983); and Proposed Mass. Rules of Evidence 801(d)(1)(c) (1980), recognized in the annotations to the proposed rule as consistent with the *Vitello* case, *supra.* Compare *Commonwealth* v. *Furtick,* 386 Mass. 477, 480-481 (1982), where, because the witness who had made an identification at a probable cause hearing did not testify at trial and was not shown (at 480) to have been then "unavailable," the pretrial identification was not treated as substantive evidence of guilt. The court, however, recognized that, if the witness had been present at the trial and admitted his probable cause testimony, that testimony "would have been admissible as substantive evidence of . . . guilt" (citing the *Torres, Fitzgerald,* and *Vitello* cases). In view of Carter's admissions of his early pretrial identifications, other cases relied on by Cappellano are distinguishable. Compare *Commonwealth* v. *Amado,* 387 Mass. 179, 188-189 (1982), the precise situations considered in the *Swenson* case, 368 Mass. at 272 n.3, the *Furtick* case, 386 Mass. at 481 n.2, and *Commonwealth* v. *Daye,* 16 Mass. App. Ct. 645, 649, further appellate review granted, 390

Mass. 1105 (1983), where at trial one witness unequivocally "denied having made a prior identification."

2. *Statements by Carter admitted for impeachment.* Cappellano contends that the trial judge, under G. L. c. 233, § 23,[6] erroneously allowed the prosecutor to impeach the credibility of Carter, the Commonwealth's own witness, by admitting testimony of third persons as to Carter's prior inconsistent statements to them on matters concerning which Carter had given testimony in court. These included the following situations: (a) Detective Walter Derby on January 24, 1981, saw Carter in the hospital. Then Carter seemed alert, although in pain, but apparently was understanding what was said around him and was responsive to questions. Detective Derby testified that Carter, asked who had shot him, replied, "Jimmy Cappellano . . . . No questions about it," and had given apparently intelligent consent to proposals of members of his family and friends then present that they go to his apartment and move his property. Carter's testimony at trial had been that he was in no condition to talk to those then about him and had no memory of the details of the discussion.

(b) Detective Derby testified that he participated in a conference between Carter and the prosecutor on June 24, 1982, about two weeks before trial. Carter then had explained his action on November 4, 1980, in reporting to the police only that his automobile had been stolen (without mentioning the shooting from which he had just escaped) by saying that he (Carter) knew that the police would identify the automobile as his and thus tie him in with Cappellano. Carter, at trial, had testified that he did this because he was in a "very confused" state on the morning of November 4.

---

[6] Section 23 reads, "The party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

We perceive in the record no failure by the prosecutor to lay a proper foundation for the admission of these prior statements to impeach Carter. See *Commonwealth* v. *LaFrance,* 361 Mass. 53, 57 (1972). In his general testimony, Carter had denied being able to see his attacker adequately on January 22, 1981. He had testified to his lack of awareness of events while in the hospital. Enough potential inconsistency between his general testimony and his prior statements to third persons reasonably could be found to justify the trial judge in permitting testimony by such third persons about these statements for impeachment purposes. *Commonwealth* v. *Cobb,* 379 Mass. 456, 462-465 (1980). *Commonwealth* v. *Greene,* 9 Mass. App. Ct. 688, 692-693 (1980). See *Commonwealth* v. *Festa,* 369 Mass. 419, 425-426 (1976); *Commonwealth* v. *Reddick,* 372 Mass. 460, 462-464 (1977). Appropriate limiting instructions were in each instance given. Carter's statement on January 24 to Detective Derby, that Cappellano had shot him, was, in any event, cumulative of Carter's testimony inculpating Cappellano already mentioned in part 1 of this opinion, received properly as substantive proof of guilt.

3. *Denial of required findings.* The trial judge properly denied a motion for required findings of not guilty. The evidence concerning Cappellano's actions on November 4, 1980, was overwhelming. The evidence of Carter's statements on January 22, 1981 (in the emergency room) and of his statements to the prosecutor on June 3, 1981, taken with the other evidence as to the events on January 22, was sufficient to make it improper for the judge to require findings that Cappellano was not guilty of any of the offenses charged.

4. *Motion to sever indictments.* On July 6, 1982, six days before trial commenced, the assistant district attorney and defense counsel had a lobby conference with the trial judge. Discussions concerning severance then were heard on the statements of counsel.

Some six months earlier new defense counsel had replaced an attorney who had withdrawn his appearance for Cappel-

lano. When retained, new defense counsel had indicated to the prosecution that his defense to both sets of indictments (i.e., whether based upon the November 4, 1980, or the January 22, 1981, episodes) was to be insanity. That also appeared to be the defense position at an earlier pretrial conference before the same judge on December 7, 1981, although there then was very minor discussion of the question of trying both cases together.

By July 6, 1982, defense counsel sought to sever for trial the two sets of indictments. The assistant district attorney then summarized the events of November 4, 1980, and January 22, 1981, essentially as already stated. He pointed out to the trial judge that, but for Carter's escape on November 4, he would have been "taken upstairs and . . . [perhaps] killed along with the other persons there." This could be regarded as a suggestion by the prosecutor that the shooting of Carter on January 22 was the culmination of Cappellano's plans thwarted by Carter's escape on November 4. The prosecutor also represented to the trial judge that, contrary to three or more identifications of Cappellano by Carter as his assailant on January 22, made during or shortly after that episode, Carter was then having second thoughts about his earlier identification.

The trial judge made inquiry about the connections between the two episodes, in addition (a) to the circumstance that in each Carter was a victim, and (b) that the January 22 events would be viewed perhaps as motivated by Cappellano's desire to get rid of a principal witness to the November 4 episode concerning which a probable cause hearing was shortly to take place. There was discussion of whether (if the cases in fact should be severed) evidence as to either one of the episodes could be introduced at the trial of Cappellano for the crimes involved in the other episode. It was suggested that in each case, evidence of the other episode would be admissible to show Carter's possible bias against Cappellano and possibly also of the latter's consciousness of guilt. It was recognized that the two episodes were separated in time by about two and one-half months. Refer-

ence was made to the long friendship of Carter and Cappellano and to their past close business relationship, which, after both episodes had taken place and following negotiations, had been dissolved at least to some extent. These relations were mentioned as ground for suspicion of Carter's then recent "backing off from the identification of the [January 22] assailant." The trial judge concluded that the prosecution had "a reasonable basis to anticipate [that] Carter . . . [would] testify as he earlier did" in statements on and shortly after January 22, identifying Cappellano as his then attacker, although the judge recognized the existence of "a professional responsible concern [that] there may be an erosion of that testimony." Defense counsel, indeed, toward the end of the discussion, even said, "My defense is the insanity defense."

On the whole showing made before him on July 6, the trial judge, within his discretion, reasonably denied the motion to sever the two groups of indictments. *Commonwealth* v. *Cepulonis,* 374 Mass. 487, 499 (1978). *Commonwealth* v. *Sylvester,* 388 Mass. 749, 753-758 (1983), and cases cited. *Commonwealth* v. *Gallison,* 383 Mass. 659, 671-672 (1981). Compare *Commonwealth* v. *Blow,* 362 Mass. 196, 200 (1972).[7] He was justified in regarding the connection between the two episodes as outweighing whatever prejudice would be consequent upon joinder.[8]

---

[7] Cappellano's counsel is not shown to have filed any affidavit in support of his motion for a severance, although the motion avers, in general terms, that a joint trial would be prejudicial to Cappellano. The assistant district attorney, in support of his request for a joint trial, filed a comprehensive affidavit, consistent with his representations to the trial judge at the conference on July 6. See Mass.R.Crim.P. 9(a), 378 Mass. 859-860 (1978); *Commonwealth* v. *Ellis,* 12 Mass. App. Ct. 612, 620-621 (1981); *Commonwealth* v. *Egan,* 12 Mass. App. Ct. 658, 665 (1981). There was no significant, detailed argument on July 6, 1982, by defense counsel concerning the respects in which Cappellano would be harmed by a joinder of the indictments for trial.

[8] At the close of the evidence (other than expert testimony on Cappellano's criminal responsibility) there was only very brief reference (not pursued) by defense counsel to the possible conflict between his position with respect to the first episode where Cappellano admitted the shooting

The case seems to us distinguishable from *Commonwealth* v. *Moran,* 387 Mass. 644, 651-661 (1982), where two defendants were involved (see *Bruton* v. *United States,* 391 U.S. 123, 132-138 [1968]) and there were differences between their respective "mutually antagnostic and irreconcilable" defenses and their extrajudicial statements. See 387 Mass. at 659. *Commonwealth* v. *Hoppin,* 387 Mass. 25, 32-34 (1982), also seems to us distinguishable on its facts. There wholly unrelated offenses were joined for trial. The present case deals with related events which, at the time the trial judge denied severance, seemed likely (as in fact it developed on evidence which the jury were entitled to believe) to have a reasonable connection, one with the other.

*Judgments affirmed.*

---

but claimed that he was insane at the time and his position on the second episode where Cappellano did not admit shooting Carter but was "saying he wasn't there" and also "bound to say [to the jury], 'However, but even if you don't believe that, if I did it, I was insane at the time.'"